[Sac. No. 2570. In Bank.—September 14, 1917.]

COLUSA & HAMILTON RAILROAD COMPANY (a Corporation), Appellant, v. ELLA GLENN LEONARD et al., Respondents.

EMINENT DOMAIN—RAILROAD RIGHT OF WAY—DAMAGES—DANGER OF INJURY BY FLOOD TO REMAINING LANDS—Where in eminent domain proceedings it is proposed to take for a railroad right of way land which is subject to overflow by flood waters, and to construct the roadway in such manner that in the event of flood the proposed work will retard the passage of the flood waters and result in the destruction of growing crops and other injuries to the remaining lands not taken, a depreciation in the value of the remaining lands caused by such enhanced danger of flood is a proper element of damage.

ID.—EVIDENCE—PROBABILITY OR IMPROBABILITY OF FLOOD—EXPERT TESTIMONY.—Testimony of witnesses to their knowledge of past floods and flood conditions, their knowledge of the value of farming real estate, and their knowledge or belief as to the effect the construction of a roadway of a railroad would have in depreciating the value of adjacent land by the retardation of flood waters thereon is properly admitted on the trial of an eminent domain proceeding to condemn lands.

ID.—ELEMENTS OF DAMAGE GENERALLY.—In such an action all matters and conditions which may reasonably be expected to follow the

location and operation of the road and affect the value of the land should be considered.

ID.—WATERCOURSE—CONSTRUCTION OF SECTION 465, CIVIL CODE.—A depression or trough or slough which serves as a drainway for overflow water after the main body of flood waters has subsided cannot properly be termed a watercourse within the meaning of subdivision 5 of section 465 of the Civil Code, which gives to railroads power "to construct their roads across, along, or upon any stream of water, watercourse . . . in such manner as to afford security for life and property; but the corporation shall restore the stream or watercourse . . . to its former state of usefulness," but even treating it as such, a railroad has no right so to construct its roadbed as to interfere with the free and unobstructed office which such slough or channel performs, and if it does so, such interference will constitute an element of damage.

ID.—OPINION EVIDENCE—EXPERIENCED FARMERS.—Experienced farmers who have observed the action of flood waters for many years are competent to give an opinion as to the sufficiency of the openings in a proposed railroad embankment to permit flood waters to run off and the tendency of such an embankment to back up the water.

ID.—SUFFICIENCY OF INSTRUCTIONS—DAMAGE FROM FLOOD WATERS.— Where the court has given a requested instruction that "in ascertaining the damages to or depreciation in the market value of that part of the property not sought to be taken in this proceeding, you are not to indulge in speculation, surmise, or conjecture. The law does not require plaintiff to pay damages or compensate for depreciation of the market value of the property not sought to be taken in this action based upon speculation, surmise, or conjecture," it was not error to strike out from the requested instructions and refuse to instruct the jury in addition: "In other words, you are instructed that no damage to or depreciation of the market value of that portion of the property invoked here, not sought to be taken in this proceeding by reason of flood water, can be based upon speculation, surmise, or conjecture."

ID.—DIMINUTION IN SUBSTANCE.—Where the court had given several instructions which in effect told the jury that the damage contemplated by the Constitution is the damage to the property itself, considered with reference to the uses to which it was adapted, it was not prejudicial to refuse to instruct the jury in terms that "the property itself must suffer some diminution in substance or be rendered intrinsically less valuable by reason of the public use."

APPEAL from the Superior Court of Glenn County. Wm. M. Finch, Judge.

The facts are stated in the opinion of the court.

Frank Freeman, and Geo. R. Freeman, for Appellant.

Duard F. Geis, and Arthur C. Huston, for Respondents.

Sullivan & Sullivan and Theo. J. Roche, *Amici Curiae;* Devlin & Devlin, *Amici Curiae.*

HENSHAW, J.—Plaintiff by this action in eminent domain sought to acquire as a roadway for its railroad a strip of land running north and south, in part dividing and in part on the westerly boundary of the farming lands of defendants. These lands, in all about 560 acres, are low-lying lands, in a natural state subject to overflow from the Sacramento River. They are situated in the county of Glenn and the Sacramento River forms their easterly boundary. On this river frontage is built a high and strong levee, constructed in 1910, after the exceptionally high floods of 1909. Notwithstanding that in the years that have elapsed the flood waters have risen to the height attained in 1909, this levee has confined the waters of the river and there has been no overflow. In the earlier years before the erection of the levees, at flood seasons the river overflowed its banks some twelve times in forty-five years. Some distance to the west of the levee is an irrigating canal, with banks not so high as the levee, but still several feet higher than the embankment proposed to be built on the railroad right of way, for it should here be said that this case was tried under plans and drawings showing the construction which the railroad proposed to make —in part a low fill, in part trestle work for the passage of flood or storm waters. Defendants set up two elements of special damage; first, that the construction of the railroad in the manner contemplated and the severance of the larger tract from the portion sought to be condemned, by reason of the flood waters of the Sacramento River, would damage, one hundred acres of land lying west of the proposed right of way to the extent of $25 per acre; the second, under like averment, was to the effect that the lands lying east of the proposed right of way—495 acres—would be damaged to the extent of $35 per acre. Evidence upon these matters was admitted by the court, and the jury under this evidence found the damage arising from these causes to be $15 an acre; or, in other words, the jury found that the market value of the land

had been or would be depreciated by virtue of this railroad construction to the extent of $15 per acre.

This cause was first decided by the district court of appeal and was taken over by this court for the further consideration of two propositions; the first whether defendants were entitled to recover damages because of this asserted flood danger; and, second, if they were, whether or not the evidence offered by defendants upon the matter was not too remote, speculative, and uncertain to stand as the basis for an award of damages.

The law governing the consideration of the question of damage is, first, the familiar provision of section 14, article I, of the Constitution, to the effect that "private property shall not be taken or damaged for public use without just compensation," and, second, subdivision 2 of section 1248 of the Code of Civil Procedure, which declares that if the property sought to be condemned constitutes only a part of a larger parcel, the court or jury must ascertain and assess "the damages which will accrue to the portion not sought to be condemned, by reason of its severance from the portion sought to be condemned, and the construction of the improvement in the manner proposed by the plaintiff." Appellant's position may be thus stated: Respondent's claim of special damage grows out of an asserted depreciation in the market value of their property because the proposed work of appellant will impede the free passage of flood waters if a flood should come upon such land, and this retardation of the natural passage of the flood waters over the land will result in a destruction of growing crops and in other similar injuries to their property. (This is not controvertible, for such in truth is respondents' evidence.) Next, argues appellant, every owner of property in California may use all legitimate means to protect his land against flood waters, even though that protection shall result in actual and appreciable injury or damage to another's property, for that damage is, under our law, *damnum absque injuria.* Such in truth are our uniform decisions. (*Lamb* v. *Reclamation Dist.*, 73 Cal. 125, [2 Am. St. Rep. 775, 14 Pac. 625]; *McDaniel* v. *Cummings*, 83 Cal. 515, [8 L. R. A. 575, 23 Pac. 795]; *Gray* v. *Reclamation Dist. No. 1500*, 174 Cal. 622, [163 Pac. 1024].) Appellant admits that if its taking of the land and the use which it proposes to make of the land taken actually and physically interferes

with the natural or artificial protection against flood possessed by the untaken portion of the tract; if, for example, the use to be made of the land involved a cutting of the levee or any other similar act, compensation for this would be justly allowable. But, so runs its argument, if it owned the strip of land sought to be taken, it would be within its legal rights in building the embankment in the legitimate use and protection of its property, even if the construction did increase the danger of damage by floods to the remaining land, and that as it could unquestionably do this as the owner of the land, without making compensation to the adjacent land owner for injuries which might result from its necessary and proper works, so here in this condemnation suit such prospective damage, even though it be said that it would be in truth a real damage, cannot legally be used to increase respondents' award.

This argument is not only persuasive but forceful. The fallacy of it, however, lies in this consideration; what a man may legally do in the exercise of his rights of ownership is not identical in fact or in principle with what he may justly be called upon to pay in the acquisition of such ownership. A simple illustration will, we think, plainly illustrate our meaning. A municipality owns a block of land in a highly desirable residence quarter of the city. It proceeds to build thereon a hospital for contagious diseases—in short, a pesthouse. The direct and immediate effect of this is to depreciate to a very substantial extent the value of the surrounding residence property. But while the court might listen with sympathetic ear to the lamentations of the owners of those properties, it could not salve their grief by compensation in terms of money because the city was exercising one of its unquestioned rights of ownership, and the injury which that exercise inflicted, though real, was *damnum absque injuria*. But in the same residence section the city by eminent domain seeks to condemn one-half of a block owned by an individual for the purpose of erecting thereon a pesthouse. The depreciation in the value of the remaining property is marked, and measurable in terms of money. If the city sought to buy from the owner at private purchase this same property, no one would question but that the owner would, and properly would, fix as a purchase price a sum which would compensate him for the inevitable reduction in value

of the remaining part of his land.   When the city goes into court to acquire this same property by judicial decree, the same elements fairly enter into the transaction and are admissible in evidence under the very terms of our law.   Therefore the question before us is not what an owner may do with his own property without liability for the damage which his legal acts may inflict upon his neighbor's property, but it is, what is the fair price for the purchaser to pay for that property where avowedly he proposes to use it in such a way as will directly operate to depreciate the value of the untaken part of the realty?

This principle, it will be found, is recognized in all the adjudications.   In this state we do not permit the owner of lower lands to interfere with the natural surface flow from the lands above, to the detriment of those latter lands.   In other states the common-law rule to the contrary is adopted. In those other states, as a brief consideration of their authorities will show, it is uniformly held that in eminent domain proceedings, the injury to the remaining lands which may result from interference with the surface flow is a proper element for the consideration of the jury in fixing its award of damages, and this, of course, notwithstanding the fact that under their law the same interference could be occasioned without liability to damage by one who was the owner of the property.   Thus says Lewis (2 Lewis on Eminent Domain, sec. 496) : "It would be difficult to enumerate the various elements of damages proper to be considered when part of a tract is taken. . . . Any interference with the drainage of the land or with the flow of surface water, or with the water supply, are recognized by all authorities as proper items to be taken into account in assessing the damages."   In support of the text may be cited Farnham on Waters and Water Rights, secs. 357, 904; *Walker* v. *Old Colony & Newport R. R. Co.,* 103 Mass. 10, [4 Am. Rep. 509] ; *Arkansas Valley etc. Ry. Co.* v. *Witt,* 19 Okl. 262, [13 L. R. A. (N. S.) 237, and note, 91 Pac. 897] ; *Wichita & W. R. R. Co.* v. *Kuhn,* 38 Kan. 104, [16 Pac. 75] ; *Churchill* v. *Beethe,* 48 Neb. 87, [35 L. R. A. 442, 66 N. W. 992].   It follows, therefore, that the court was right in recognizing the principle that a depreciation in the value of the remaining lands caused by the enhanced danger of floods was a proper element of damage to go before the jury.

We come next to the character of the evidence which the court allowed to go before the jury in support of the claim for special damage. Herein respondents admit that the proposed works of appellant would impair the value of their remaining land only in the event of flood, and, conversely, if there was no possibility of flood, there would be no depreciation in value because of the works. Upon this appellant argues that its proposed use of the land would not in the slightest increase the danger of the flood, that if a flood did result it would occur through no contributing act or fault of appellant, and that the evidence shows that by virtue of the massive levee construction any real danger of a flood has been eliminated. Second, appellant argues that, as established by the evidence of respondents, the damage which appellant's works would cause in the event of flood would arise only from the fact that those works retarded the free flow of the flood waters off of the remaining portion of respondents' land; that appellant's expert evidence demonstrated that these proposed works would not so retard the water, as ample passageways for the water were left in the embankment, and that the conflicting evidence was that of unqualified, inexpert farmers, whose testimony should not have been received.

Touching the first of these matters, it is sufficient to say that unless it could be established that the danger of flood was absolutely eliminated, the improbability of such a flood occurring goes only to the weight of evidence as affecting a lessening of value, rather than to the admissibility of the evidence itself. It cannot be said, as matter of law, that plaintiff's proof of the strength and sufficiency of the levees demonstrated that no flood would ever again occur. Upon the second proposition in its objection to the admissibility of the evidence, appellant bears down too hard on but one phase of the testimony given by the farmer witnesses of respondents. In effect they were called upon to testify to their knowledge of past floods and flood conditions, to their knowledge of the value of the farming real estate, and to their knowledge or belief as to the effect which appellant's proposed work would have in depreciating the value of respondents' real estate because of the retardation of flood waters which would result if the works were constructed as proposed. Upon this last branch of inquiry these witnesses, now generally speaking, did testify as to their belief that the proposed works

would interfere with the free passage of the flood waters, would cause the waters to stand longer upon respondents' lands, and that this danger did appreciably reduce the market value of those lands. Only in the sense that they testified to the inadequacy of the proposed works as granting free and unimpeded passage to the flood waters can it be said that their testimony was at all in the nature of expert evidence, going to the character and adequacy of the proposed works to relieve from flood waters. But manifestly this is not the kind of expert testimony forbidden to be received, but is rather of the character held admissible in such cases as *Sowden* v. *Idaho Quartz Min. Co.*, 55 Cal. 451; *Frey* v. *Lowden*, 70 Cal. 552, [11 Pac. 838]; *Posachane W. Co.* v. *Standard*, 97 Cal. 480, [32 Pac. 532]; *Nolan* v. *Nolan*, 155 Cal. 476, [132 Am. St. Rep. 99, 17 Ann. Cas. 1056, 101 Pac. 520], and *Gallatin* v. *Corning Irr. Co.*, 163 Cal. 405, 419, [Ann. Cas. 1914A, 74, 126 Pac. 864].

It is concluded, therefore, that the court of appeal was correct in its judgment, which judgment expresses the same conclusions as those here presented. The foregoing, therefore, may be considered as an amplification of the opinion of the court of appeal, to which reference has been made, which is hereby adopted, and which is as follows:

"Plaintiff commenced the action to condemn a right of way for plaintiff's railroad over defendants' land, containing 11.93 acres. Defendants answered that the construction of the railroad as proposed by plaintiff would cause defendants great damage and expense for various alleged reasons and, among others, the following:

"9. That the amount of land within the said right of way sought to be taken and condemned herein, by the said plaintiff for the said railroad right of way is 11.93 acres, and the value of the said land is the sum of three hundred dollars per acre, and the value of the interest of the said defendants is the sum of $3,579.

"10. That the construction of the railroad in the manner contemplated and proposed by the plaintiff, will sever the larger tract, not sought to be condemned, into two parts, to wit: One part lying west of the proposed right of way, containing 100.17 acres, and one part lying east of the proposed right of way containing 485.57 acres.

"11. That all of the said lands of the said defendants are subject to overflow by and from the flood waters of the Sacramento River, and that the said flood waters do flow to, upon, over, across, and away from the lands of the said defendants, and all of the said lands lie along and are adjacent to, the said Sacramento River. That the construction of the proposed railroad across the said lands of the said defendants, in the manner proposed by the said plaintiff, will interfere with, obstruct, and prevent the free flow of the flood waters of and from the said Sacramento River that will come upon the said lands of the said defendants from flowing over, across, and away from the said lands of the said defendants, and will cause the said flood waters to back up, accumulate, be held back and stand upon the said lands of the said defendants lying on the east side of the proposed right of way.

"12. That the construction of the railroad in the manner contemplated and proposed by plaintiff, and the severance of the larger tract, not sought to be condemned, from the portion sought to be condemned, and by reason of the flood waters of the Sacramento River that will come upon, back up, accumulate, be held back and upon the lands that lie west of the proposed right of way, to wit, the 100.17 acres, will be damaged to the extent of twenty-five dollars per acre, making a total damage to the said lands lying on the west side of the proposed right of way of $2,504.25.

"13. That the construction of the railroad in the manner contemplated and proposed by the plaintiff, and the severance of the larger tract, not sought to be condemned, from the portion sought to be condemned, and by reason of the flood waters of and from the Sacramento River, that will come upon, back up, accumulate, be held upon the said lands of the said defendants that lie east of the proposed right of way, to wit, the 485.37 acres, will be damaged to the extent of thirty-five dollars per acre, making a total damage to the said lands lying on the east side of the proposed right of way of $16,987.95."

The issue of damages raised by the pleadings was submitted to and tried by a jury and the questions given them by the court were answered as follows:

"1. We, the jury in the above-entitled action, ascertain to be and assess the market value of the land sought to be condemned by plaintiff, belonging to defendant, to wit: 11.93 acres for right of way at ———.   Answer: $175 per acre.

"2. We, the jury, ascertain to be and assess the depreciation in the market value of the land not taken by reason of the construction of the railroad in the manner proposed at ——. Answer: $15 per acre.

"3. We, the jury, assess the value of the fencing on the right of way to be $507.

"4. We, the jury, ascertain and assess the cost of the fencing for said right of way to be $480.

"5. We, the jury, ascertain and assess the cost of the one 60 ft. crossing and one 40 ft. crossing with cattle guards to be $400."

Judgment passed for defendants accordingly, from which plaintiff appeals under the alternative method.

The located line of the railroad runs practically north and south through the counties of Glenn and Colusa, parallel with the west bank of the Sacramento River, varying with its course, but, at the place involved, is over half a mile west of the river at the nearest point, that point being called Jacinto, where defendants reside. The located line follows along the west line of defendants' property, from its south boundary, for the first three-quarters of a mile, to a point where a county road, called Bayliss-Jacinto road, runs east and west through the land to Jacinto and the river. North of this road the located line continues north through the property a quarter of a mile, leaving about one hundred acres on the west side of the track and about 87 acres on the east side. The tract on the south consists of about four hundred acres. In the entire tract are 597.47 acres and the Sacramento River is its east boundary. In 1910 a substantial levee was built along the west bank of the river, replacing the old one, to protect this land and other lands from river overflow. Some distance west of this levee is what is called the Sacramento Valley West Side Canal Company irrigating canal, twenty-five feet wide on the bottom and twenty-five to thirty feet wide at the top, the excavation being thrown out on its banks on either side but not so high as the levee. This canal is about half a mile east of the located line of the railroad.

The points urged on appeal are: 1. That all the evidence as to flood waters "was erroneously admitted as too remote, speculative and uncertain"; 2. That evidence was admitted as to the effect of the proposed railroad construction upon the flow of such waters "by witnesses without any knowledge

whatever on that subject which should be handled only by men trained in such matters"; 3. That, conceding such evidence to have been properly admitted, "it is insufficient to warrant the verdict rendered as to depreciation upon the lands not taken, for the evidence and verdict show that the verdict was based wholly upon this flood-water 'bogey-man' ''; 4. That "it clearly appears that there is a well-defined, natural, and regular channel or watercourse within which all this flood water, when it escapes from the river, at all times flows, which watercourse finally deposits this water in Colusa Basin," and hence "subdivision 5 of section 465 of the Civil Code takes care of such a situation."

In the case of *Colusa etc. R. R. Co.* v. *Glenn,* reported in 25 Cal. App. 634, [144 Pac. 993], the rule for computing damages was stated as given in *Blunck* v. *Chicago & N. W. Ry. Co.,* 142 Iowa, 146, [120 N. W. 737], as follows: "The real question in such cases being how much has the market value of the property been diminished by taking the right of way therefrom, it is manifest that in determining and fixing such damages all matters and conditions which may reasonably be expected to follow the location and operation of the road and affect the value of the land should be considered." In the opinion the court, by Mr. Justice Burnett, said: "If there is a reasonable probability that the construction of plaintiff's railroad as contemplated will augment the damage to the land caused by flood waters, of course, this is a circumstance to be considered by the jury in arriving at a proper award. Whether there is such reasonable probability is a matter of opinion based upon certain physical facts which are detailed by some of the witnesses. From plaintiff's showing the inference would follow that no probable damage would ensue from this source and that the market value of the land would not be affected by this circumstance." (The testimony of an expert witness is quoted in which the witness stated in effect that the velocity of the increased quantity of water would cause it "to pass off in the same length of time as now. The trestles that we have located on this road will take care of all the water that comes on the Glenn place, no matter where it comes from.") Continuing, it was said, in the opinion: "There was expert evidence, however, on behalf of defendant to the effect that the railroad as intended to be constructed would hold back the water on something like 480 acres of land. On this assump-

tion the opinion was expressed that the market value would be greatly depreciated. We are not prepared to say that there was no basis for such opinion. The matter is, of course, somewhat speculative, depending upon various contingencies, but if thereby the market value of the land is diminished, defendant has the right to make proof of it, and there is no available method by which to show this fact except through the opinion of competent witnesses." This case involved an inquiry into conditions similar in most respects to those existing in the present case. The land lies north of and adjoining the present defendants' land and is crossed by the proposed railroad, and would be affected by the construction of the road in much the same manner. The two cases are so nearly alike as to make the same principles of law equally applicable to both cases.

The evidence showed in the instant case that, prior to the construction of the present levee, in 1910, the river, in flood seasons, sometimes three or four times in one season, overflowed its banks, and the levee formerly constructed, at a depth of two or three feet and the waters spread out over the back country at Jacinto to and beyond the west line of defendants' land, "a solid sea of water," as witnesses described it, three or four feet deep; that the banks of the canal, which was built prior to the levee of 1910, gave way in places and melted down under the pressure—in fact, were practically submerged; that the trend of these flood waters was south and westerly, and as they subsided found their way into a depression or slough which carried off the remaining waters, and it is this so-called watercourse on which plaintiff relies in making its point 4. We may here as well as elsewhere dispose of this point. Section 465 of the Civil Code declares that a railroad corporation has power: " . . . 5. To construct their roads across, along or upon any stream of water, watercourse, . . . which the route of its road intersects, crosses or runs along, in such manner as to afford security for life and property; but the corporation shall restore the stream or watercourse . . . thus intersected to its former state of usefulness as near as may be, or so that the railroad shall not unnecessarily impair its usefulness or injure its franchise." The evidence was that the proposed track of plaintiff's roadbed traversed substantially this depression on the west slope of it, although there was evidence that this so-called channel

is at places west of the located track. A ninety-foot trestle was provided for at a point not far from midway of the lower tract of land and another of the same length at a point in the north tract, the purpose being to allow flood water to pass to and from each side of the track. One question was whether these openings sufficiently served their purpose, which will be given attention later.

The evidence was that this depression or trough or slough, as it is variously termed by witnesses, has its head near the Sacramento River upon the land north of defendants' land, and was a drainway for the overflow water after the main body had subsided. It could hardly be properly termed such watercourse as is referred to in the code. But treating it as such, the plaintiff had no right so to construct its roadbed as to interfere with the free and unobstructed office which this slough or channel performed, and, if it did so, such interference would constitute an element of damages to defendants. The principle involved was applied in *Coates* v. *Atchison, T. & S. F. Ry. Co.,* 1 Cal. App. 441, [82 Pac. 640] ; *Southern Pacific R. R. Co.* v. *Hart,* 3 Cal. App. 11, [84 Pac. 218]. In this connection plaintiff urges the doctrine which treats flood waters as a common enemy against which a land owner may protect himself though to the detriment of an abutting land owner; citing *Sanguinetti* v. *Pock,* 136 Cal. 466, [89 Am. St. Rep. 169, 69 Pac. 98], among other cases, where the doctrine was quite fully gone into in connection with Mormon slough in San Joaquin County.

We can hardly think plaintiff serious in its contention that before it becomes an abutting land owner at all and is merely seeking a right of way by condemnation proceedings, it may defend against damages claimed for what may happen in the future should it become such abutting owner and should afterward carry out its proposed improvement. We see no merit in this branch of appellant's argument. Nor do we think the defense made under section 465 of the Civil Code maintainable.

It appeared that plaintiff's proposed road over this strip of land was to be constructed upon a definite plan, which was presented to the court and jury as part of its case, showing how the roadbed or embankment was to be built, its width being eighteen feet on top; that ten feet of the top was to be surfaced with gravel fifteen inches thick, into which ties

were to be imbedded and tamped and on top of these ties the rails to be fastened, making a solid embankment about three and one-half feet high; that a trestle ninety feet wide in the embankment at a definite place in the lower piece of land and another of like dimensions in the upper tract, and culverts at the Bayliss-Jacinto road, were to be constructed. In short, the case was tried as though there was a completed structure of the dimensions given in the plan laid before the jury.

At this point we may dispose of another question raised in appellant's brief, namely, that whatever damage may be caused by some negligence in constructing the roadbed or by some improper construction thereof "may be recovered by appropriate actions by the parties damnified when such damages occur, and nothing should be allowed on the theory that such negligence may happen"; citing *Turpen* v. *Turlock Irr. Dist.*, 141 Cal. 1, [74 Pac. 295]. The action was tried, as we have stated, on a theory which conceded that the question of damages, whatever they might be, would be considered on the assumption that the roadbed was to be constructed upon the plan laid before the jury. In the Turpen case the question was as to damages arising after the construction of the works. We are not to deal with the question as though it had first arisen after the completion of the road. We are dealing with the law under condemnation proceedings. Section 1248 of the Code of Civil Procedure furnishes the rule, which is: " . . . (2.) If the property sought to be condemned constitutes only a part of a larger parcel, the damages which will accrue to the portion not sought to be condemned, by reason of its severance from the portions sought to be condemned, and the construction of the improvement in the manner proposed by the plaintiff." In the case of *Conniff* v. *San Francisco*, 67 Cal. 45, 50, [7 Pac. 41], the court quoted from *Pumpelly* v. *Green Bay Co.*, 13 Wall. 166, [20 L. Ed. 557], as follows: "Where real estate is actually invaded by superinduced additions of water, earth, sand, or other material, or by any artificial structure placed on it so as effectually to destroy or impair its usefulness, it is a taking within the meaning of the Constitution." In *Reardon* v. *San Francisco*, 66 Cal. 492, 505, [56 Am. Rep. 109, 6 Pac. 317, 320], the court gave a direct answer to appellant's contention. It said: "We are of the opinion that the right assured to the owner by this provision

of the Constitution is not restricted to the case where he is entitled to recover as for a tort at common law.  If he is consequently damaged by the work done, whether it is done carefully and with skill or not, he is entitled to compensation for such damage under this provision.  The provision was intended to assure compensation to the owner as well where the damage is directly inflicted, or inflicted by want of care and skill, as where the damages are consequential, and for which damages he had no right of recovery at common law.''  (See a clear statement of the rule in *Chicago* v. *Taylor,* 125 U. S. 161, [31 L. Ed. 638, 8 Sup. Ct. Rep. 820] )

It appeared from the statements of witnesses for defendants that they based their judgment as to the depreciation of defendants' property in considerable part upon the effect of plaintiff's road as it is to be constructed would have in holding back the flood waters of the Sacramento River.  This same class of evidence was held admissible in the Glenn case (25 Cal. App. 634, [144 Pac. 993]), *supra,* and we see no reason to change our opinion on the subject.  The testimony as to the effect which the proposed railroad would have is here as it was in the Glenn case irreconcilably conflicting.  Witnesses, a large number of them, testified that the trestles provided for in the roadway were wholly inadequate to allow the large volume of water coming over the land in flood times to pass through them; that the necessary effect of the railroad embankment would be to hold the water back a considerable length of time longer than it would be under conditions as they now exist, and would result in the destruction of crops which would otherwise escape by the water passing off much more quickly than it could when held back, as it must be, by the railroad.  Disputing the fact, but recognizing the rule as to conflicting evidence, appellant contends that the danger of such damage occurring is too remote and uncertain to be a just element of damages.  This contention is based chiefly on the protection now given the land by the levee which has stood against the flood waters since 1910 and because of the further protection afforded by the canal embankments.  This latter protection may be dismissed from consideration, for the evidence was that should the levee give way, the canal embankments would not withstand the pressure of flood waters.  It is matter of common knowledge that levees are by no means impregnable or that they furnish an insurance

against the assaults and ravages of flood waters. There is always possible increase in the height of the flood plane arising either from unusual rainfall or from other system of levees which increase the demand upon previously constructed systems. There is danger from the encroachment of the river itself in undermining constructed levees by washing away the margin of the bank usually left between the levee and river, and it was in evidence that the river had washed away forty feet in one place in its tendency to reach the levee. Gophers and squirrels are constant enemies whose attacks are not always visible. There is, too, an element of danger from the ease with which a personal enemy of one's self or some neighbor may with dynamite destroy the levee temporarily in the height of a flood. These are some of the risks to which land owners living under levee systems are subjected. While it is true that levees enhance the value of land which they protect, it is also true that it would give still greater value to the land if the land owners could be assured that such levees would never give way to flood waters.

In the Glenn case, under conditions of fact substantially the same as here, we said: "The matter is, of course, somewhat speculative, depending upon various circumstances, but if thereby the market value of the land is diminished defendant has the right to make proof of it and there is no available method by which to show this fact except through the opinion of competent witnesses." There were other elements besides this one of danger from flood waters which were considered by the jury, but we think it must be conceded that the verdict cannot be justified by these other elements alone, for witnesses stated that their estimates of damages necessarily included consideration of damages from flood waters.

We are brought to the question, Were the witnesses competent to testify to the facts upon which the jury based their verdict? Most of defendants' witnesses were farmers who had been familiar with flood conditions in that neighborhood and the effect upon the lands of defendants for twenty or thirty years, and were also familiar with the market value of land in the vicinity. They were informed of the plan proposed for the construction of the railroad as we have outlined it and were asked whether or not it would depreciate the value of the land not taken. Answering that it would, they were asked to state how much per acre, and answered giving vari-

ous estimates running from fifteen to thirty dollars per acre. Then followed their reasons, among which was the opinion that the trestles would not carry the water coming to them in flood overflows and that the water would be "held back," as they expressed it, and prevented from passing off freely and thus cause the damage which in part was included in their estimate.    There was evidence that the damage to crops depended upon the length of time the water stood on them. Their testimony was corroborated by that of Civil Engineer Bayard Knock, who gave it as his opinion that the railroad embankment would back the water to the river; that it would keep water from getting west of the track and deepen it east; that the trestles would relieve it some, but how much he could not say; that it "would make a difference in the fastness with which the water got off"; but how much longer it would take the water to pass off than under present conditions he could not say.    It seems to us, however, that an intelligent farmer who had observed the action of flood waters for many years would be competent to give an opinion that two openings, each ninety feet long and three feet high and half a mile apart, would not allow the flood waters three or four feet deep flowing with some velocity and spreading over four or five hundred acres to pass through them as rapidly as it would accumulate against the railroad embankment; and that the embankment would have a tendency to "back up" the water and keep it from passing off as freely as it otherwise would, especially as the road is located so as to obstruct the depression in the land, more or less, which otherwise would help to hasten the flow of the water.    These physical facts, which the farmers must have confirmed from their every-day experience, would, it seems to us, need no expert civil engineer to verify.    Such testimony may not be so convincing as that of persons trained in a school of practical hydraulic engineering, but we think it was competent.

Plaintiff asked the following instruction: "In ascertaining the damages to, or depreciation in the market value of, that part of the property of the defendants, Ella Glenn Leonard and Charles L. Leonard, not sought to be taken in this proceeding, you are not to indulge in speculation, surmise, or conjecture.    The law does not require plaintiff to pay damages or compensate for depreciation of the market value of the property not sought to be taken in this action based upon

speculation, surmise, or conjecture; [in other words, you are instructed that no damage to, or depreciation of, the market value of that portion of the property involved here not sought to be taken in this proceeding by reason of flood waters can be based upon speculation, surmise or conjecture].'' The court struck out the concluding paragraph marked in brackets. The instruction as given implied all that was stated in the eliminated portion and it must be presumed that the jury applied it to evidence relating to flood waters as well as to other evidence.

The court refused the following instruction: '' The law does not authorize a remedy for every diminution of the value of the property that is caused by a public improvement. The damage for which compensation is to be made is a damage to the property itself, and does not include a mere infringement of the owner's pleasure or enjoyment. Merely rendering private property less desirable for certain purposes, or even causing personal annoyance in its use, will not constitute the damage contemplated by law; but the property itself must suffer some diminution in substance or be rendered intrinsically less valuable by reason of the public use.''

The court gave the following instruction: ''After you have determined the market value of the strip of land sought to be condemned for the right of way, you must then ascertain and assess the amount of depreciation of the market value, if any, which may accrue to the portion of the land not taken by reason of the construction of the railroad in the manner proposed. This damage, if any, will be determined by ascertaining in the same manner as heretofore stated the market value for cash of those portions of said tract not taken, as it was on the twenty-third day of December, nineteen hundred and thirteen, and by deducting therefrom the market value for cash of said property after the severance and the proposed railroad is constructed. The difference between these values, if there shall be any, will be the amount of the depreciation of the market value of the land not taken. The law fixes this method of ascertaining the damages, and it is your duty to follow it.''

The court also instructed the jury as follows: ''Unless you find by a preponderance of evidence that the owners of the land sought to be condemned in this proceeding will be disturbed in their enjoyment of some right to which they are

entitled to make use of in connection with their land, you cannot find that they were damaged within the sense of the Constitution of the state of California, which provides that they shall receive full compensation for the taking or damage of the land in a proceeding of this character. You are instructed that the market value of the land sought to be condemned in this action is not to be determined by its value for any particular use, but, resulting from a consideration of all the uses for which it is adapted, and to which it may be applied it is only when the market value of the land is diminished by a public use that it can be said to have sustained such damage as will entitle the owner to receive compensation."

There were several instructions which in effect told the jury that the damage contemplated by the Constitution is the damage to the property itself considered with reference to the uses to which it was adapted. The court did not in terms say that "the property itself must suffer some diminution in substance or be rendered intrinsically less valuable by reason of the public use," but the jury must have understood from the instructions that they were considering the damage to the property itself, which necessarily meant "some diminution in substance." Indeed, while lawyers may understand what those terms mean, it is doubtful whether a jury would be enlightened by hearing them given. "Diminution in substance" might, unexplained, be understood to mean the digging up and carrying away the soil, which, of course, is not intended by the term. We do not think the refusal to give the instruction was prejudicial.

Some other instructions are criticised, but we do not think it necessary to comment upon them particularly. The instructions given were clear and accurate statements of the law, and if there was evidence relating to matters which might have influenced the jury improperly—for example, danger of loss of stock by breaking down the railroad company's fences, or danger to persons in crossing, or of personal annoyance or infringement of the owner's pleasure, such evidence, no doubt, if any there was, would have been limited by instructions if requested. We cannot see that the plaintiff was prejudiced to an extent requiring a reversal by any instructions given or refused.

But one objection to rulings on evidence is complained of, and this related to the admission of testimony as to the construction of the railroad across Charles Glenn's land immediately north of defendants' land. It appeared that the plans contemplated a roadway or embankment about the same as over defendants' land with one sixty-foot trestle. As the flood waters of the river first entered upon the land from the Charles Glenn land and as the character of the railroad construction over his land had a certain effect lower down, the evidence was admissible. The court limited it to the Charles Glenn land.''

The judgment and order appealed from are therefore affirmed.

Melvin, J., Shaw, J., Sloss, J., Lawlor, J., and Angellotti, C. J., concurred.

Rehearing denied.