[L. A. No. 17826. In Bank. Dec. 21, 1943.]

THE PEOPLE, Appellant, v. ANTONINO RICCIARDI
et al., Respondents.

Lincoln V. Johnson, Clifford D. Good, Holloway Jones, George C. Hadley, C. R. Montgomery, Frank B. Durkee and Robert E. Reed for Appellant.

Robert W. Kenny, Attorney General, Everett W. Mattoon, Deputy Attorney General, Ray L. Chesebro, City Attorney, William H. Neal and Frederick von Schrader, Assistants City Attorney, Charles F. Reiche, Deputy City Attorney, J. Allen Davis and George E. Sandford as Amici Curiae on Behalf of Appellant.

Holbrook & Tarr and Leslie R. Tarr for Respondents.

SHENK, J.—In this action in eminent domain the plaintiff appeals from a judgment on a verdict fixing the compensation to be paid to the defendants for the land taken and for damages to the remainder by reason of the severance and the construction of the improvement in the manner proposed.

The purpose of the condemnation proceeding is to acquire land sufficient to effectuate, by means of an underpass, the separation of the grade of Rosemead Boulevard at its intersection with Ramona Boulevard in Los Angeles County. The double tracks of the Pacific Electric Railway Company traverse Ramona Boulevard on the route from Los Angeles to San Bernardino and cross Rosemead Boulevard at the intersection.

The defendants are the owners of property located at the northeast corner of Rosemead and Ramona Boulevards,

both of which are state highways. The property of the defendants is improved with a modern slaughter house and retail meat market, both set back from the highways so as to afford parking facilities. A residence with a large storage basement faces Rosemead Boulevard. Ingress and egress is afforded the entire property along both boulevards, with driveways leading into the property from the two highways.

At present Rosemead Boulevard fronting on defendants' property is 60 feet wide. By the proposed improvement it is intended to make this boulevard 280 feet wide. It will consist of four lanes, two in the underpass, and two outer lanes on each side thereof, designated as service roads, the latter being 30 feet wide. Rosemead Boulevard will commence to pass under Ramona Boulevard at a point southerly thereof and will come to grade northerly thereof at Glendon Way, the latter of which is the first cross or intersecting street north of defendants' property, approximately 525 feet north of Ramona Boulevard. The underpass will reach a maximum depth of seventeen feet. Visibility of traffic in that portion of the underpass directly in front of the defendants' remaining property on Rosemead Boulevard will be entirely cut off. Between the underpass and the remaining property a lane designated as a service road thirty feet in width is provided for at grade. A ten-foot sidewalk strip between the service road and the defendants' property is also provided for. A dividing strip 50 feet wide at Glendon Way narrowing to 25 feet at the covered portion of the underpass is between the service road and the easterly wall of the underpass. This strip is left for support and landscaping purposes.

The highway plans show that the portion of Ramona Boulevard to the north of the railway right of way is to have a 35 foot freeway for westbound fast traffic and an outer lane 30 feet wide, also called a service road, for local traffic. To the south of the railway right of way a similar freeway for eastbound fast traffic is provided for. The service road on Rosemead Boulevard and the service road on Ramona Boulevard will connect at the southeast corner of the defendants' property and at that point there is access to the westbound traffic on Ramona Boulevard. The service road on Rosemead extends to Glendon Way, which is the next intersecting street to the north. There is a conflict in the evidence as to whether the service road paralleling Ramona Boulevard extends to the next intersecting street to the east.

The service roads are at the .grade of defendants' property. When the underpass is constructed upon the westerly portion of the property taken from the defendants the grade of Rose-mead Boulevard will be changed so as to effectively block all ingress and egress to and from the main highway except by traversing the service road to Glendon Way and then making a left turn into the boulevard.

A verdict was rendered awarding the defendants $9,000 for the taking of parcel 1, and damages to the remainder by reason of the severance and the construction of the improvement in the manner proposed in the sum of $15,000. For the taking of parcel 2, the sum of $350 was allowed with no severance damages.

The main attack on the judgment is the award for severance damages. During the course of the trial witnesses were produced to prove market values. On the examination of the defendants' witnesses the plaintiff took the position and now asserts that considerations of interference with the defendants' right of access to the main highway resulting from the construction of the improvement and the consequent enforced circuity of travel to and from the property to the main highway as proposed may not properly be taken into account in fixing severance damages; also, that the defendants' claimed loss of visibility to and from the main highway as proposed could not be taken into consideration as affecting market value. At the instance of the plaintiff the trial court at first excluded all evidence relating to those subjects, but finally was persuaded by the defendants' counter position that under the facts presented such interference with access and loss of visibility should be taken into consideration in determining market value. Accordingly, the court admitted evidence bearing on those issues and submitted the question of the extent of the severance damages caused thereby to the jury. One of the principal contentions of the plaintiff on the appeal is the asserted error of the trial court in admitting that evidence.

Not every depreciation in the value of the property not taken can be made the basis of an award of damages. In the absence of a declaration by other competent authority the courts have been called upon to define rights claimed to be infringed in violation of section 14, article I, of the Constitution; also to place limitations on the extent of those rights

and to declare when and under what circumstances recovery may be had by the property owner for a violation thereof. The courts have assumed the burden and responsibility of defining those rights and of limiting their extent because of the necessity of safeguarding the constitutional rights of private parties on the one hand and on the other hand of seeing to it that the cost of public improvements involving the taking and damaging of private property for public use be not unduly enhanced. The law on the subject of the nature and extent of the rights of the property owner abutting on a public highway and of the infringement of those rights is . therefore, in substantial part, case law. For example, it has been held in this state that injury to the business of the owner or occupant of the property does not form an element of the compensating damages to be awarded (*Oakland* v. *Pacific Coast Lumber etc. Co.*, 171 Cal. 392 [153 P. 705]). This is so because it is only the value of, and the damage to, the property itself, which may be considered. A particular business might be entirely destroyed and yet not diminish the actual value of the property for its highest and best use. (See 10 Cal.Jur. 341, sec. 55.) It has also been held in this state that an abutting owner has no right to compensation by reason of diversion of traffic away from his property (*Rose* v. *State of California*, 19 Cal.2d 713 [123 P.2d 505] ; *People* v. *Gianni*, 130 Cal.App. 584 [20 P.2d 87] ; *City of Stockton* v. *Marengo*, 137 Cal.App. 760 [31 P.2d 467]).

Neither in the Constitution nor in statutes do we find any declaration of the incidents of ownership or elements of value which specifically creates or defines or limits the two rights which are involved here. But we do find general provisions of law which are basic to our consideration. Section 658 of the Civil Code declares that "Real or immovable property consists of: 1. Land; 2. That which is affixed to land; 3. That which is incidental or appurtenant to land . . .", and section 662 of the same code defines appurtenances in general language as follows: "A thing is deemed to be incidental or appurtenant to land when it is by right used with the land for its benefit, as in the case of a way, or watercourse, or of a passage for light, air, or heat from or across the land of another." Section 1248 and related sections of the Code of Civil Procedure, which prescribe the procedure in condemnation actions, do not assume to create rights of

ownership, or to define the incidents thereof or the elements of value. It is, therefore, necessary for this court to determine whether the claimed items are, or shall be, included among the incidents or appurtenances of real property within the purview of the general definition of appurtenances above quoted, and are therefore to be considered as elements of value attaching to private property and for which compensation must be paid when the same is taken or damaged for a public use in eminent domain proceedings.

The courts of this state, from time immemorial and in cases too numerous to mention, have declared and enforced the abutting property owner's right to a free and convenient use of and access to the highway on which his property abuts. (*Eachus* v. *Los Angeles etc. Ry. Co.*, 103 Cal. 614, 617 [37 P. 570, 42 Am.St.Rep. 149]; *Geurkink* v. *City of Petaluma*, 112 Cal. 306, 308 [44 P. 570]; *O'Connor* v. *Southern Pacific R. R. Co.*, 122 Cal. 681 [55 P. 688]; *Brown* v. *Board of Supervisors*, 124 Cal. 274, 280 [57 P. 82]; *Eachus* v. *City of Los Angeles*, 130 Cal. 492 [62 P. 829, 80 Am.St.Rep. 147]; *Smith* v. *Southern Pacific R. R. Co.*, 146 Cal. 164 [79 P. 868, 106 Am.St.Rep. 17]; *Williams* v. *Los Angeles Railway Co.*, 150 Cal. 592 [89 P. 330]; *Wilcox* v. *Engebretsen*, 160 Cal. 288, 299 [116 P. 750]; *Lane* v. *San Diego Elec. Ry. Co.*, 208 Cal. 29, 33 [280 P. 109]; *McCandless* v. *City of Los Angeles*, 214 Cal. 67, 71 [4 P.2d 139]; *Rose* v. *State, supra*, 19 Cal.2d 713, 727 [123 P.2d 505]; Lewis, Eminent Domain (3d ed.), p. 177; McQuillin, Municipal Corporations (2d ed.), vol. 4, pp. 79, 85; Nichols, Eminent Domain (2d ed.), p. 503.) It was declared in the case of *Eachus* v. *Los Angeles etc. Ry. Co., supra*, 103 Cal. 614 [37 P. 570, 42 Am.St.Rep. 149], at p. 617, that this right of ingress and egress attaches to the lot and is a right of property as fully as is the lot itself and any act by which that easement is destroyed or substantially impaired for the benefit of the public, is a damage to the lot itself, within the meaning of the constitutional provision under which the owner is entitled to compensation.

It is also the settled law that "An abutting owner has two kinds of rights in a highway, a public right which he enjoys in common with all other citizens, and certain private rights which arise from his ownership of property contiguous to the highway, and which are not common to the public generally; . . . An abutting landowner on a public high-

way has a special right of easement and user in the public road for access purposes, and this is a property right which cannot be damaged or taken away from him without due compensation. [Citing cases.]'' (*Lane* v. *San Diego Elec. Ry. Co.*, 208 Cal. 29, 33 [280 P. 109].)

But as we view the record in this case we are not called upon to declare new rights of property in the abutting owner but to define the extent of existing rights, to ·determine whether the trial court committed error in its rulings on the admission of evidence on the subjects of impairment of access and loss of visibility as affecting the market value of the defendants' existing property rights and whether the findings and conclusions of the trial court on those subjects are supported by sufficient evidence.

The plaintiff does not take the position that the evidence is insufficient to support some award of severance damages based on other elements bearing on market value. There is evidence of substantial severance damages on account of a reduction in size of the remaining land, of the severance of the remaining land into an irregular strip, of the curtailment of the remaining parking area, of the reduction of the commercially zoned portion of the property which corners upon the two highways, and of the impairment of the use of the property as a functioning unit caused by the taking of integral parts of the operating plant. No complaint is made of the consideration of those matters in fixing severance damages. But it is insisted by the plaintiff that no actionable interference with the right of access results from so-called circuity of travel to which an abutting owner may be subjected as the result of the construction of a public improvement; that such an interference is but an inconvenience suffered only in common with the general public; that it has no proper relation to the abutting property owner's easement of ingress and egress and that it cannot therefore be a right special and peculiar to his right of property. Counsel for the plaintiff apparently concede that if the interference is actionable it is a proper matter to be considered in fixing compensation, for it is said in that behalf that ''under the California 'or damages' clause compensation is not allowed except for an actionable interference with a property right.''

■ ''Actionable interference'' with a property right can be no different from ''substantial impairment'' of the right as that phrase is so familiarly used in the cases.

 The contention that the disputed elements of damage—the taking or impairment of the right of direct access to the through highways and the taking or impairment of the right of visibility to and from the one highway (Rosemead Boulevard) in relation to the remaining property—are noncompensable as being the result of police power regulation, cannot be sustained under the facts and law applicable here. We recognize that the defendants have no property right in any particular flow of traffic over the highway adjacent to their property, but they do possess the right of direct access to the through traffic highway and an easement of reasonable view of their property from such highway. If traffic normally flowing over that highway were re-routed or if another highway were constructed which resulted in a substantial amount of traffic being diverted from that through highway the value of their property might thereby be diminished, but in such event defendants would have no right to compensation by reason of such re-routing or diversion of traffic. The re-routing or diversion of traffic in such a case would be a mere police power regulation, or the incidental result of a lawful act, and not the taking or damaging of a property right. But here we do not have a mere re-routing or diversion of traffic from the highway; we have, instead, a substantial change in the highway itself in relation to the defendants' property; i. e., a re-routing of the highway in relation to defendants' property rather than a mere re-routing of traffic in relation to the highway. Defendants' private property rights in and to that highway are to be taken and damaged. It is only for such private property rights that compensation has been assessed. The court allowed no damages to be predicated on any diversion of traffic from the highway but it did properly allow damages to be based on diversion of the highway from direct access to defendants' property.

Prior to the enactment in 1879 of section 14 of article I of the Constitution the problem of compensating for damages to the remainder where the whole parcel was not taken did not arise. Compensation for the land taken for public use was the only matter for consideration. In *Reardon* v. *San Francisco*, 66 Cal. 492 [6 P. 317, 56 Am.Rep. 109], it was held for the first time that the addition of the words "or damaged" embraced more than the "taking" provided for in

the Constitution of 1849, and gave to the property owner a remedy which he did not previously have. The addition of the "or damaged" phrase in the present constitutional provision has given rise to many difficult problems with reference to the extent of the rights of the owner of property damaged where none is taken and where part of a larger parcel is taken and the remainder is claimed to be damaged by reason of the severance and the construction of the improvement in the manner proposed. Where the whole is taken no question of severance damages is, of course, involved.

■ When compensation is claimed either for a taking or a damaging the issues may be presented for adjudication in at least two forms of action. In one there is an absence of a proceeding in eminent domain. In that form of action the property owner seeks relief by bringing an action for compensation for a taking or a damaging of his property or both, as the case may be. Illustrative of that class of cases with many others in our reports are *McCandless* v. *City of Los Angeles,* 214 Cal. 67 [4 P.2d 139], the more recent case of *Rose* v. *State of California,* 19 Cal.2d 713 [123 P.2d 505], and the current case of *Bacich* v. *Board of Control, ante,* p. 343 [144 P.2d 818].

The other form of action is, as here, a proceeding in eminent domain in which the procedure is laid down by section 1248 and related sections of the Code of Civil Procedure. ■ In both actions the result is the same in that in each the property owner receives compensation for the invasion of his private right; but the procedure in arriving at the result is different. In the one case the property owner assumes the burden of alleging and proving his property right and the infringement thereof, and the question whether his allegations in that behalf are sufficient may be determined on demurrer. In the other case the condemning authority, in commencing the proceeding, affirmatively alleges ownership in the defendants, the contemplated taking and severance, and seeks a determination by the court of issues confided by the law to the decision of the court and also seeks a determination by the jury, unless one be waived, of the compensation which should be paid to the property owner.

It is provided in section 1248 of the Code of Civil Procedure that the jury "must hear such legal testimony as may be offered by any of the parties to the proceedings, and there-

upon must ascertain and assess: 1. The value of the property sought to be condemned, and all improvements thereon pertaining to the realty, and of each and every separate estate or interest therein; . . . 2. If the property sought to be condemned constitutes only a part of a larger parcel, the damages which will accrue to the portion not sought to be condemned, by reason of its severance from the portion sought to be condemned, and the construction of the improvement in the manner proposed by the plaintiff.'' Section 1249 provides that for the purpose of assessing compensation and damages the ''actual value'' thereof at the date specified ''shall be the measure of compensation for all property to be actually taken, and the basis of damages to property not actually taken but injuriously affected.''

The law has adopted market value as establishing actual value. (*Sacramento etc. R. R. Co.* v. *Heilbron*, 156 Cal. 408 [104 P.979].) The court said in that case at page 409 that as to the land actually taken ''the rule is of universal acceptance that the measure of this damage is the market value; that is to say, the highest price estimated in terms of money which the land would bring if exposed for sale in the open market, with reasonable time allowed in which to find a purchaser, buying with knowledge of all of the uses and purposes to which it was adapted and for which it was capable.''

As to the damages to the remainder by reason of the severance, an instruction in that case was approved which laid down the rule that such damages should be determined by ascertaining the market value of the portion not sought to be taken (as of the date fixed by statute, which in this case was November 23, 1938) and by deducting therefrom the market value thereof after the severance and the construction of the improvement in the manner proposed by the plaintiff. This measure of damages is in accordance with the provisions of the code sections referred to. Such damages may be shown by proving the market value of the remainder before and after the taking and leaving the computation of the difference to the jury, or by competent evidence of severance damages in a lump sum as was done by the testimony of witnesses in this case. Of course, as above indicated, in applying this rule damages may not be allowed for diminution of property value resulting from highway changes causing diversion of traffic, circuity of travel beyond an intersecting

street, or other noncompensable items. (See *Rose* v. *State of California, supra; Bacich* v. *Board of Control, supra.*)

When the proceeding comes on for hearing all issues except the sole issue relating to compensation, are to be tried by the court, and if the court does not make special findings on those issues its findings thereon are implicit in the verdict awarding compensation. (*Vallejo etc. R. R. Co.* v. *Reed Orchard Co.*, 169 Cal. 545, 556 [147 P. 238]; *Oakland* v. *Pacific Coast Lumber etc. Co., supra*, 171 Cal. 392 [153 P. 705] at page 397.) In the Vallejo case the court said at page 556: "A condemnation suit is a special proceeding. It is not included in the classes mentioned in section 592 [Code of Civil Procedure] in which a jury is required. That section is expressly made applicable to condemnation suits. (Code Civ. Proc. § 1256.) It follows that, except those relating to compensation, the issues of fact in a condemnation suit, are to be tried by the court, and that if the court submits them to a jury it is nevertheless required to make findings either by adopting the verdict thereon or by making findings in its own language." In the Oakland case the point was urged that the question whether the parcels of land involved constituted one parcel within the meaning of section 1248 of the Code of Civil Procedure must be submitted to the jury for determination. The court said at page 397: "But neither the state nor any of its mandatories, nor any other person or corporation, exercising the power of eminent domain, is compelled to submit to the determination of a jury every question of fact (*Vallejo etc. R. R. Co.* v. *Reed Orchard Co.*, 169 Cal. 545 [147 P. 238]), and this question of fact (namely, whether or not, the probative facts being without controversy, the resultant fact establishes the existence of a parcel from which a portion is to be taken) is essentially a question of law for the determination of the court. It is only the 'compensation,' the 'award,' which our constitution declares shall be found and fixed by a jury. All other questions of fact, or of mixed fact and law, are to be tried, as in many other jurisdictions they are tried, without reference to a jury. (Const., art. I, § 14.)" The law declared in these two cases has been followed in this state without deviation.

It was therefore within the province of the trial court and not the jury to pass upon the question whether under the facts presented, the defendants' right of access will be sub-

stantially impaired. If it will be so impaired the extent of the impairment is for the jury to determine. This is but another way of saying that the trial court and not the jury must decide whether in the particular case there will be an actionable interference with the defendants' right of access. This the trial court did when it ruled on the admission of evidence and in its instructions to the jury.

In admitting the evidence objected to by the plaintiff the trial court was necessarily guided by the settled law with reference to an abutter's rights and by the facts presented in the case. The record is voluminous and consists of a large relief map, numerous other maps and many volumes of transcribed testimony. This evidence was before the court at the close of the defendants' case at which time the ruling was made permitting the expert witnesses to testify to the effect upon the market value of the property not taken by reason of the contemplated improvement and the consequent requirement that the owner must thereafter take another route to reach the through traffic lane which before the improvement was immediately in front of his premises. To sustain the plaintiff's position would require a ruling by this court to the effect that although a landowner's easement of access has been substantially impaired, under no circumstances should circuity of travel occasioned thereby enter into a computation of the damages to be awarded. Such a ruling obviously would be beyond the bounds of propriety. Certainly the plaintiff would not contend that if the underpass be constructed as proposed and no means of access to Rosemead Boulevard be provided for, the defendants would be without redress. It is too plain to admit of argument that if the underpass be constructed as proposed and the service roads were not provided for in the contemplated improvement, the defendants' right of access to Rosemead Boulevard would be practically destroyed. In providing for the service roads the state must be deemed to have proceeded in frank recognition of the private right of access possessed by the defendants, that such right would be invaded, and intended by means of those service roads to minimize and entirely absorb the damages to which the defendants would otherwise be entitled. But in any event the question whether the defendants possessed a right which was damaged was for the trial court to determine. As to how much the service roads would miti-

gate the damage, i. e., how much would be the net damage, was a question of fact for the jury. (See *Knox County* v. *Le Marr*, 20 Tenn.App. 258 [97 S.W.2d 659, 661].)

▇ It is also the position of the state that evidence of loss of visibility has not been justified in this case as a part of access and that it can be justified on no other theory. The weight of authority seems to be in favor of the proposition that an abutting owner of property on a public highway has an easement of reasonable view of his property from the highway (90 A.L.R. 793, 794, and cases cited; 29 C.J.S., p. 912, sec. 905). The right of reasonable view in addition to the right of ingress and egress is named as one of the easements possessed by the abutting owner in *Williams* v. *Los Angeles Ry. Co.*, 150 Cal. 592, 595 [89 P. 332]. Here again it was for the trial court to determine whether the obstruction caused by the underpass would unreasonably cut off defendants' property from visibility by travelers on the main highway, and, the right being substantially impaired, the amount of damage was a question for the jury. ▇ The findings and conclusion of the trial court implicit in the verdict are supported by the evidence and may not now properly be disturbed.

▇ No just criticism can be made of the severance damages awarded in the light of the record in this case. The entire property was valued at as much as $68,000 and the severance damage was estimated as high as $41,779. In view of this evidence an award of $15,000 on the latter item cannot be set aside on appeal.

▇ The plaintiff complains of certain instructions given and of the refusal to give others. Instruction No. 22 as given is assigned as error because by it the court advised the jury that the question whether the defendants had suffered an infringement of their rights in the property not sought to be condemned was a "question of fact for the jury" to determine. The giving of that instruction was error, but no prejudice resulted from it, because the record shows beyond question that the defendants would suffer an infringement of their rights by the construction of the improvement in the manner proposed. Furthermore, the trial court had in effect already held that such impairment would be suffered and, as above stated, its finding and conclusion in that respect are implied in the verdict.

Certain language in the opinion in *McCandless* v. *City of Los Angeles*, supra, 214 Cal. 67 [4 P.2d 139], at page 71, is referred to by the defendants as justifying that instruction. It is there said: "Whether the infringement of her right is special and peculiar to the plaintiff's property and has resulted in a substantial impairment of her right, is a question of fact . . ." The purpose of the appeal in that case was to test the sufficiency of the complaint to state a cause of action for damages for an alleged infringement of a property right of the plaintiff. That was the only question involved on the appeal and in passing on it the following was said immediately after the language last above quoted: "and we think the complaint is sufficient in alleging not only the special and peculiar nature of the infringement as applied to said property, but also the substantial impairment of that right. At least it may not be said as a matter of law that the plaintiff under her allegations has suffered no damage."

When both quotations are considered together it is obvious that the discussion had to do solely with the sufficiency of the complaint to state a cause of action. The quoted language relied upon by the defendants as justification for the challenged instruction was not as full as it might have been, but it is a correct statement of the law so far as it goes. A more complete statement of the law on the subject would have been that the question whether there has been a substantial impairment of her property right is a question of law, or of fact, or a mixed question of law and fact, for the trial court to determine. In no case is it a "question of fact for the jury" to determine.

No error appears because of the refusal to give the plaintiff's proposed instruction No. 22. It would have advised the jury that any element of depreciation in market value of the property not sought to be condemned by reason of the construction of the improvement in the manner proposed would be of a general nature and not special and peculiar to the defendants' property. The subject matter of this instruction was not for the consideration of the jury and was properly refused.

Other instructions given are criticized by the plaintiff but we find no error in any of them.

No question of the exercise of the police power by the state is involved in this case. The case is simply a condemna-

tion suit in which the only questions properly to be determined on appeal are whether the court erred in overruling objections interposed by the state to the introduction of certain evidence on the question of severance damages, whether the court erred prejudicially in the matter of instructions to the jury and whether the verdict is supported by the evidence.

There is no other contention of the plaintiff which is not effectively disposed of by the foregoing discussion and authorities.

The judgment is affirmed.

We concur: Gibson, C. J., Carter, J., and Schauer, J., concurred.

EDMONDS, J.—I am unable to concur in an opinion which, unsupported by authority in this state or elsewhere, under the guise of "defining" existing property rights, extends the provisions of article I, section 14, of the California Constitution to a degree never before recognized, thereby establishing rules of decision which will, in large measure, make the construction of necessary highway improvements prohibitive in cost. More specifically, I dissent from the conclusions of my associates as stated by Mr. Justice Shenk for the following reasons:

(1) Despite the law uniformly to the contrary throughout the United States, the decision entitles an abutting property owner to compensation for the additional distance he must travel in the public street before he reaches the lanes of a highway carrying the through traffic.

(2) In allowing recovery for such "circuity of travel," the court is already ignoring the restrictions just prescribed by it in *Bacich* v. *Board of Control, ante,* p. 343 [144 P.2d 818], limiting recovery to the owners of property lying between an obstruction and the first intersecting street.

(3) For the first time in the judicial history of the state, recovery is allowed because the main flow of traffic, when passing through a subway constructed for the safe and convenient use of the highway, will no longer have a completely unobstructed view of the abutting landowner's premises.

(4) In stating the rule creating this right of view against the State, the decisions distinguishing between the unlaw-

ful impairment or obstruction of view in the public street by a private individual and a lawful interference with the view of abutting property occasioned by necessary and proper highway construction, are ignored.

(5) Although recognizing the established rule in this state denying compensation for a diminution in value of land occasioned by a highway project diverting traffic from in front of his premises, the court inconsistently holds that the owner may recover damages because a person traveling upon the street as rebuilt no longer can view his property.

(6) The opinion studiously avoids passing upon one of the vital questions presented in this appeal. There is no determination as to whether a landowner is entitled to compensation for any reduction in the width of the street upon which his property abuts or whether his easement of access may be said to extend only to such portion and width of the street as is reasonably necessary for the purposes of ingress and egress of the abutting owner, considering the nature of his property and the particular uses to which it is adaptable.

(7) The procedure to be followed in the ascertainment of the new property rights and the determination of the amount of damages to be awarded for interference with them is left in complete uncertainty. The inconsistent pronouncements of my associates upon these issues will be a fruitful source of litigation. They say that whether the proposed improvement has resulted in a substantial impairment of a property right is a question of law or of fact, a contradictory statement impossible of application by the legal profession or the courts upon the trial of a condemnation suit or on an appeal. Adding to the confusion is the declaration that the landowner is entitled to the difference between the market value of the entire parcel of land before a portion of it is taken under the power of eminent domain and the market value of the land remaining after the severance, although it is declared that certain elements diminishing the value may not be considered. To me, such statements can only mean that those who have joined in the majority opinion are not themselves in agreement upon these questions and concur in ambiguity which hereafter may be said to support either of the variant positions.

(8) Although stating that a court, in defining rights

claimed to be infringed in violation of the constitutional provision, must balance against the necessity of safeguarding private property the duty to see "that the cost of public improvements . . . be not unduly enhanced," the rule is not applied.

(9) Notwithstanding the admission that the trial judge erred in instructing the jurors that the question as to whether the respondents had suffered an infringement of their rights in the property not sought to be condemned was one for them to determine, my associates decide that the court had, by the admission of evidence, held that such impairment would be suffered and therefore no prejudice resulted. Yet the giving of this instruction completely negatives any prior ruling by the court upon that issue. Furthermore, if such a determination is a question of law, as stated in some parts of the opinion, no ruling upon it could be "implied in the verdict." And if it is a question of fact, one is confronted by the statement: "In no case is it a 'question of fact for the jury' to determine."

To understand fully the respective rights of the property owner and of the State requires, in my judgment, a more complete statement of the nature and extent of the proposed highway improvement than appears in the opinion of my associates and a summary of the testimony upon which the property owner was awarded damages. I shall therefore first present facts additional to those detailed by them and then, considering all of the evidence which to me is relevant to the questions for decision, state the reasons for my conclusion that the judgment appealed from should be reversed and a new trial ordered upon the issue of consequential damages.

As described by Mr. Justice Shenk, because of the construction of an underpass with service roads parallel to it and within the boundaries of the boulevard as widened, the State is "re-routing the highway." Under any view of the testimony, this statement can apply only to Rosemead Boulevard. And as to that thoroughfare, as well as Ramona Boulevard, in my opinion the evidence shows only a widening of each of them with lanes and freeways designed in accordance with modern requirements for the protection and acceleration of motor vehicles and the separation of grades at a major traffic intersection.

The project for which part of the respondents' land is

being condemned may be readily comprehended from the accompanying photograph of a relief map used at the trial. The boundaries of the two parcels of land owned by the respondents, as they existed at the time this action was commenced, are outlined on the map. In design the engineering details for the widening and reconstruction of the two streets are comparable to those of many improvements now being planned for modernizing important highways to meet present day needs.

Rosemead Boulevard, a part of the state highway system designated as Route 168 (Streets and Highways Code, sec. 468) is one of the main arteries of travel in a suburban district near Los Angeles. It is intersected by Route 26 of the state highway system (Streets and Highways Code, sec. 326) which, for some distance on either side of Route 168, bears the name of Ramona Boulevard, and is divided by the tracks of the Pacific Electric Railway Company. In the vicinity of the property in controversy, the northerly travel lane of Ramona Boulevard, that is, the portion of the highway lying along the northerly boundary of the railroad right of way, commences at a dead end approximately two blocks west of Route 168 and continues across it to the east a distance of about a mile and a quarter, intersecting a number of streets. That part of Route 26 which lies to the south of the tracks is a paved road west of Route 168 for several miles. To the east of the intersection it is unpaved and, as described by one of the respondents' witnesses, "an ordinary lane."

In 1938, the Highway Commission adopted a resolution reciting that public interest and necessity require the acquisition and construction of a state highway upon certain real property. The Department of Public Works was directed to acquire the necessary land by condemnation. Thereafter, the present action was commenced.

The property mentioned in the resolution and in the complaint is described as two parcels, each of which fronts on Rosemead Boulevard. Together they may be roughly described as the westerly 90 feet and the southerly 32 feet of about three acres of land owned by the respondents.

Attached to the complaint is a map showing the boundaries of this land and the portions of it sought to be condemned, another giving the detailed plan for "Proposed Separation of Grades of Rosemead Blvd. & Ramona Blvd.," and a third depicting a cross section of the proposed improvement of Rosemead Boulevard. From these maps and the evidence offered upon trial, it appears that the State is acquiring the land described in the resolution and the complaint, all of which is owned by the respondents, for the purpose of reconstructing the two state highways and separating the grade of the center portion of Route 168 (Rosemead Boulevard) from Route 26 (Ramona Boulevard), and carrying it under that street in a subway. When the project is completed, for

several hundred feet from the intersection of the two highways the width of Route 168 will be 280 feet and that of Route 26, including a center section carrying the railroad tracks, 255 feet.

Using the street names in further description of the grade separation project, north of Ramona Boulevard, the widening of Rosemead Boulevard will end at Glendon Way, which is the first intersecting street. The distance between them is about 525 feet. To the east of Rosemead Boulevard, Ramona Boulevard will occupy the increased area for a much greater distance and far beyond the easterly line of the respondents' land.

South of Glendon Way, Rosemead Boulevard will have two roadways, each of which will be 35 feet wide. At a point in the neighborhood of 150 feet south of Glendon Way, they will commence to decline in a subway through which they will be carried under Ramona Boulevard at a maximum depth of approximately 18 feet. For safety purposes, the two roadways will be divided by an area four feet in width and curb high. Paralleling these traffic lanes the State will construct what it terms "service roads" at approximately the present grade of Rosemead Boulevard which will continue to Ramona Boulevard. They will afford direct access to the adjacent property.

The highway plans show that the portion of Ramona Boulevard to the north of the section used by the railroad is to have a 35 foot freeway for westbound fast travel and an outer lane 30 feet wide, also described as a service road, for local use. The portion of Rosemead Boulevard to continue at the present grade will intersect that part of Ramona Boulevard which is designed for local travel. When the two highways are reconstructed, the land of the respondents not taken by the State will have frontage on the "service roads" connecting with the center lanes reserved for traffic through the subway and also with Ramona Boulevard freeways.

Over the objections of the State, expert witnesses for the property owners explained that they had considered as an element of consequential damage the fact that the widening of the two boulevards and the construction of the underpass would block the respondents' land from access to the main traveled portions of the highways except through the circuitous routes afforded by the outer lanes. They further testified,

over a similar objection, that another factor entering into their estimate of severance damages was what they termed "loss of visibility."

One of these witnesses pointed out that before the highways are reconstructed a person may reach or leave the Ricciardi property at any point along its frontage on the two streets. After the widening and reconstruction of Ramona Boulevard, said he, the land "will have a direct contact only on . . . a narrow lane or alley which has been termed by the State as a service road. On the west, the property which now abuts on Rosemead Boulevard will have no access [to it] . . . but will abut . . . on another alley or lane or so-called service road." The service road paralleling Ramona Boulevard, he told the jury, "apparently is not carried out so that there is any direct contact with the easterly end of Ramona Boulevard." It will be a dead end street, making it necessary "to come through another opening at this point . . . down to Ramona Boulevard." And only by following the service road along the westerly boundary of the respondents' property to Glendon Way may one reach Rosemead Boulevard. Moreover, by governmental regulation, in his opinion, a left-hand turn will be prohibited in the intersection of Glendon Way and Rosemead Boulevard.

On the subject of loss of visibility the witness stated that the difference in grade of the center travel lanes of Rosemead Boulevard and the construction of the subway will greatly impair efficient ingress to and egress from the property because one driving north through the underpass will not be able to see it before reaching the point where a turn can be made. As to travel in the opposite direction, he added, the visibility will be greatly impaired by the change of grade which begins at Glendon Way. Using Rosemead Boulevard as it will be reconstructed, in approaching the property "additional means of perception" must be used.

The same reason was given by another witness as the basis, in part, for his opinion concerning the amount of severance damages which the respondents will sustain on account of the loss of visibility. When the state's project is completed, he explained, a traveler proceeding north under Ramona Boulevard will not be able to see the Ricciardi property from the point at the south entrance of the underpass where the decline commences, to about the same relative place on the

other side of the structure. He must then travel to Glendon Way and turn back. And, by the time one going in a southerly direction on Rosemead Boulevard arrives at the former southerly line of the Ricciardi property, he will then be 18 feet below the present grade of the highway. "It is my opinion," he concluded, "that the view will be sufficiently interfered with so that anyone desiring to reach Mr. Ricciardi's property will be inclined to lose his way on account of the circuitous route and fail to reach the property for that reason."

A third appraiser in stating the factors he considered in his estimate of the amount of severance damage which the property owners will sustain by reason of the reconstruction of the two highways included among them the following: ". . . Previous to the construction of the improvement Parcel No. 1 had free and easy access or ingress and egress both on Ramona Boulevard and on Rosemead Boulevard. . . . After the construction of the proposed improvement . . . the two center lanes of Rosemead Boulevard will be on a changing grade along the entire frontage of the Ricciardi property."

Continuing his testimony and speaking as of a time when the highways are rebuilt, he said that the Ricciardi property "hasn't any egress or ingress whatever directly on either Rosemead Boulevard or Ramona Boulevard. The only means of ingress and egress is by service roads . . . which run in a circuitous route from all directions, and in order to reach the Ricciardi property it is necessary to take one of those service roads from either Ramona Boulevard or Rosemead Boulevard. . . ."

Upon this and other evidence, the jury awarded the respondents $9,000 as the value of Parcel No. 1, and $15,000 as damages for its severance from the remainder of the property. The value of Parcel No. 2 was placed at $350, with no severance damages. No complaint is made concerning the amount determined to be the value of the land taken from the respondents in connection with a street widening and grade separation project, but it is charged that the evidence does not support the award of $15,000 made for severance damages.

Where a portion only of a landowner's property has been taken for a public improvement, the question necessarily arises as to the amount of compensation to which he is entitled for the reduction in value of the remaining parcel.

Three alternative formulas have been used. In a few jurisdictions consequential damages have been allowed as part of the value of the land taken by appraising the value of the part with reference to the diminution in value of the whole. Another group of courts has stated that just compensation in a partial-taking case should be measured by the difference between the market value of the whole before the taking and the market value of the remainder after the taking. The formula accepted in the majority of states, however, is the value of the part taken plus damages to the remainder. (Orgel, Valuation Under the Law of Eminent Domain, 1936, p. 218.) My associates properly recognize that every diminution in value of land caused by public improvement is not compensable under the eminent domain clause of the California Constitution. It is therefore apparent that the test to be used in this state is not the difference between the market value of the land before the taking and the market value of the remainder following the severance but that this jurisdiction is committed to what may be termed the majority rule.

The necessity for allowing recovery on a basis other than the difference in market value of the entire parcel before the taking and the market value of the land remaining after the severance is clear, for many acts of government resulting in a reduction in the value of private property may be performed with impunity by citizens acting in their own self-interest. A municipality, for example, may establish a public building seriously impairing the value of adjacent residential property. It need pay no compensation for this injury,[1] but neither would a private citizen be liable for a similar damage resulting from the construction of an equally undesirable office building. Obviously, the value of real estate may decrease very materially as the result of the use which an adjacent property owner may lawfully make of his land, and since the owner has no right of action against such an individual for the damages thus caused, by the same token it may

---

[1] The government may condemn private property and erect upon it a jail or ''pest house'' without compensating adjacent property owners for the undeniable impairment of their property values as a result of such public use. (See *Eachus* v. *Los Angeles etc. Ry.*, 103 Cal. 614, 617 [37 P. 570, 42 Am.St.Rep. 149]; *Rigney* v. *Chicago*, 102 Ill. 64, 80; *City of Winchester* v. *Ring*, 312 Ill. 544, 550-552 [144 N.E. 333, 36 A.L.R. 520]; *City of Geary* v. *Moore*, 181 Okla. 616 [75 P.2d 891], distinguishing *Oklahoma City* v. *Vetter*, 72 Okla. 196 [179 P. 473].)

not reasonably be said that compensation for similar damage caused by the lawful use of property owned by the public was intended to be guaranteed to private individuals under the eminent domain clause of the California Constitution. (*Archer* v. *City of Los Angeles,* 19 Cal.2d 19, 24 [119 P. 2d 1]; *O'Hara* v. *Los Angeles County Flood etc. Dist.,* 19 Cal.2d 61, 63 [119 P.2d 23].) Therefore, since such factors may necessarily have contributed to reduction in market value of land remaining after the severance of part of it by the state, it is apparent that the difference in market value before and after the taking is an improper formula for ascertaining recoverable compensation.

Moreover, any distinction predicated upon the allowance of compensation for a reduction in value of land attributable to a lawful use of state property because there has been an appropriation of part of it, when no compensation would be awarded for the same element of damage without such a severance, is unsound. For, obviously, it would be unfair discrimination to reimburse a property owner for such damage to his property simply because a portion of it, however small, may have been condemned, while denying to one from whom no land is taken recovery for a comparative reduction in value of his land. To allow a recovery to one property owner but not to another under such circumstances would obviously be arbitrary and unsupportable under the provisions of article I, section 14, of the California Constitution requiring compensation for a "damaging" as well as a "taking" of private property. Any language in *Colusa & Hamilton R. R. Co.* v. *Leonard,* 176 Cal. 109, 113 [167 P. 878], indicating the possible propriety of the distinction, is unwarranted and should be disapproved. Although it may be difficult, it is nevertheless necessary to exclude evidence as to that diminution in value which an owner of land from which a part has been taken may have suffered along with adjacent property owners because of the use detrimental to the remainder of his property.

The present action concerns property to which the State has title, and is now using, for highway purposes. Because of this fact, "The inauguration of a new use of a highway under proper authority within the general purposes for which the highway was created, is generally held not to constitute a 'taking or damaging' of the property of the abutting owner

within the constitutional provision. The public has the right, as against the owner of the fee, to prepare and reserve the whole or a part of a highway for special forms of travel.'' (18 Am.Jur., Eminent Domain, sec. 188, pp. 818, 819.) One of the purposes, however, for which highways are created is to provide a means of access to property abutting upon it. Consequently, as stated by the majority opinion, the courts have declared and enforced the property owner's right of access to the highway on which his property abuts. But the easement of access, properly defined, may be said to extend only to such portion and width of the street as is reasonably necessary for the purposes of ingress and egress of the abutting owner, considering the nature of his property and the particular uses to which it is adaptable. (See *Rose* v. *State of California*, 19 Cal.2d 713, 728 [123 P.2d 505]; 1 Lewis, Eminent Domain [3d ed. 1909], p. 190.) Accordingly, the owner of abutting land has no absolute right, as against the public, to insist that the adjacent street always remain available for use in the same manner and to the same extent as when it was constructed. Regulations such as the prescribing of one-way traffic or the prohibiting of left-hand turns upon it may interfere to that extent with the right of access without subjecting the municipality to liability for the resulting impairment. (See note, 100 A.L.R. 487, 491-493.)

The abutting owner's easement does not, therefore, as a matter of law, entitle him to the use of the full width of the street, nor does it include the right to a street wholly free of obstruction. Thus the mere narrowing of a street is not *ipso facto* an infringement of his right of access (*Brown* v. *Board of Supervisors*, 124 Cal. 274, 281 [57 P. 82]; and see *Bigley* v. *Nunan*, 53 Cal. 403), but where there is evidence showing that the reduction in width has left a street insufficient in width to afford ingress and egress in a reasonable manner, an interference with his right is clearly established (*Rose* v. *State of California, supra*). Similarly, a change in the grade of a street or the construction of an improvement thereon does not per se constitute an interference with the right of access (*Brown* v. *Rea*, 150 Cal. 171, 174, 175 [88 P. 713]; *Montgomery* v. *Santa Ana etc. Co.*, 104 Cal. 186, 190 [37 P. 786, 43 Am.St.Rep. 89, 25 L.R.A. 654]; *City of San Mateo* v. *Railroad Commission*, 9 Cal.2d 1, 9, 10 [68 P.2d 713]), but if the obstruction substantially interferes with ingress and

egress to the property, considering its nature and the particular uses to which it is adaptable, the easement of access is impaired. (*Rose* v. *State of California, supra; Eachus* v. *City of Los Angeles,* 130 Cal. 492 [62 P. 829, 80 Am.St.Rep. 147]; *Williams* v. *Los Angeles etc. Ry. Co.,* 150 Cal. 592 [89 P. 330]; *Lane* v. *San Diego Elec. Ry. Co.,* 208 Cal. 29 [280 P. 109]; *McCandless* v. *City of Los Angeles,* 214 Cal. 67 [4 P. 2d 139].)

For example, in *Eachus* v. *Los Angeles etc. Ry. Co., supra,* the defendant railway company made an excavation in the street in front of the plaintiff's property which varied in depth from 20 to 28 feet, leaving only a 10-foot strip in front of the premises for access. And in *Williams* v. *Los Angeles etc. Ry. Co., supra,* the construction by the railway company of a switch and signal tower in the street in front of the plaintiff's business premises directly interfered with his right of ingress and egress. Because the railway company, in *Lane* v. *San Diego Elec. Ry. Co., supra,* constructed its track so close to the plaintiff's land that a vehicle could not be parked in front of it while a streetcar passed by, the court held that the landowners' right of access was substantially and seriously impaired. Likewise, the construction of a pedestrian subway terminal so that it extended in front of and adjacent to one-third of the plaintiff's premises, which were zoned for general business purposes, was held, in *McCandless* v. *City of Los Angeles, supra,* to be a substantial impairment of the owner's right of ingress and egress.

The street improvement which occasioned the controversy in *Rose* v. *State of California, supra,* was very similar to that shown in the present case. There, however, the elimination of the grade crossing and construction of the subway left land fronting upon a 14-foot lane for vehicular traffic, an insufficient space to afford reasonable means for ingress and egress, considering the possible use of the property for industrial purposes. According to the testimony, the lane was too narrow for two vehicles traveling in opposite directions to pass, and upon the ground that the record showed substantial evidence to support the finding of interference with the easement of access, a judgment for the plaintiff was affirmed. In the present case, however, after the project is completed, the respondents' property will abut, along the same two sides as

before the improvement was begun, upon roadways 30 feet in width. No facts are testified to by the witnesses for the respondents showing that the 30-foot roadway provides an insufficient means of access for a full and reasonable use of the property, considering its nature and the particular uses to which it is adaptable. Certainly no interference with the easement of access for the use of the property as a slaughter-house, with facilities for the operation of a wholesale and retail meat market, is established merely by the fact that the roadways are 30 feet wide.

It is true that the appraisers who testified on behalf of the respondents premised their opinions as to severance damages, at least in part, upon their conclusion that after the subway project is completed, the Ricciardi property will not have frontage on either Rosemead or Ramona, but on what one of them described as a "narrow lane or alley." That the roadways will not be narrow lanes or alleys is apparent from their width and relation to the project as a whole. Whether those upon which the property will front will still be called "Rosemead" and "Ramona" boulevard, respectively, is not disclosed by the evidence, although the conclusion that they will be a part of those highways is implicit in the testimony of one of the respondents' appraisers who spoke of the roadway passing through the subway as "the two *center* lanes of Rosemead Boulevard." (Italics added.) But, in any event, the solution of the problem of compensation depends upon much more fundamental considerations than the mere label or change in name of a particular street, and a property owner has no right to insist upon the retention of a highway name.

Of more importance is the fact that, by resolution, the California Highway Commission has authorized the condemnation of the Ricciardi property for Route 168 of the state highway system, declaring "that the taking of said lands in fee is necessary to and for such public use and that it is necessary that all of said lands be so taken"; also "that the said proposed State highway is planned and located in a manner which will be most compatible with the greatest public good and the least private injury." And according to the map and the exhibits, only one right of way for state highway Route 168 is shown, which is the full width of approximately 280 feet, the various separate construction de-

tails, being all within the exterior boundaries of that right of way. In addition, the explanation made by the state's highway engineer, whose testimony is relied upon by both the respondents and the appellant, shows that Highway 168 in the vicinity of the subway project, with the service roads and the sloping walls, will be 280 feet in width, and that the 255-foot right of way directly south of the premises will be a part of Route 26. He also testified that the service roads "were a part of the major plan" and "appurtenant to the whole thing as a unit." Unquestionably, the entire 280 feet of the widened Highway 168 and the 255 feet which, with the exception of the railroad tracks in the center, is to be occupied by Highway 26, will be used for essential highway purposes, title to all of this land being in the state.

Obviously, the safety objectives of the subway would be to a serious degree defeated should traffic be allowed to enter or cross the main flow of passage through it at the entrances to the tunnel. Additional complications also would arise through the change in grade necessary for the vehicular traffic to pass beneath the railway tracks on Rosemead. Under such circumstances, the aptly designated service roads are necessary to the successful utilization of the subway, form an essential part of the project for separation of grades and will furnish the only reasonable means for the owners of land now abutting on Rosemead Boulevard as presently constructed, and those others of the public who presently approach Rosemead along the north side of the railroad tracks on Ramona, safely to enter the through flow of traffic on Rosemead.

So far as the owners of or visitors to the Ricciardi property are concerned, upon the completion of the contemplated improvement, they will still have unobstructed access to the highway system. After the changes are completed, if they wish to travel west they may either immediately turn into the westbound freeway of Highway 26 through the opening in the curbing separating the Ramona service road from the freeway, which is located at the corner of their premises, or continue over the subway on the service road in a westerly direction until they choose to enter the freeway at some subsequent opening in the curbing. In going east, they may immediately go in an easterly direction along the Ramona service road until they come to the first intersection crossing the railroad tracks, where they may enter the eastbound

freeway of Ramona located just south of the railway right of way. Similarly, in traveling north, they may immediately go north on the service road paralleling the through channels of Rosemead and enter those lanes at Glendon Way. The only direction in which they may not immediately travel is to the south on Rosemead. In order to go south, they must travel north on either of the service roads paralleling the subway structure and then turn into the southbound traffic on the lanes of Rosemead leading to the underpass. But the fact that the particular portion of the highway system upon which they will immediately travel does not directly enter into "the two center lanes of Rosemead Boulevard" is because such an entry would be unsafe, and also impracticable because of the change in grade necessitated for the underpass. And if they were allowed to cross the railway tracks, upon the same grade as the track, in order to enter the service roads paralleling Rosemead on the south side of the underpass, one of the essential objectives in constructing the subway would be lost. The additional distance which they must travel before entering the main flow of traffic on Rosemead is required by the public safety and the proper and reasonable construction of the subway. It is no different from the additional distances one must travel because of traffic regulations or the construction of divided highways. Under these circumstances, as the respondents will be afforded full and unobstructed access to streets bordering their premises on the same sides as their property presently abuts on the highways, and it will be sufficient for their needs of ingress and egress, no compensation is recoverable merely because of the additional distance they must travel in the public street before they will be able to turn into the lanes of traffic leading under the subway, so that they may travel south on Rosemead Boulevard.

But the respondents claim that the service roads will be constructed as a means of compensating the abutting owners in lieu of paying them in money for the damage resulting from the improvement. Those joining in the majority opinion have been misled by this specious argument, as shown by their statement: "In providing for the service roads the state must be deemed to have proceeded in frank recognition of the private right of access possessed by the defendants, that such right would be invaded, and intended by means of those service roads to minimize and entirely absorb the damages to

which the defendants would otherwise be entitled." But, as is clearly apparent from the evidence, the vital purpose of the service roads is to provide a means for Highway 168 to connect with Highway 26 so that traffic can flow between them, and this fact is conclusively shown from the resolution of the Highway Commission. And since an earlier junction of the service road with the underpass highway would safely be impracticable at any more southerly point than Glendon Way, the means adopted are not unreasonably more drastic than necessary to achieve the ends essential to the construction and completion of the Rosemead and Ramona crossing at the separated grades required for the underpass.

The basic error of the majority opinion in allowing recovery for the additional distance travelers to and from the Ricciardi property must go in order to reach the through lanes of traffic upon Rosemead Boulevard, lies in its misconception of the right of access of an abutting owner upon the highway system. For the owner's right of access is only over whatever street or portion of the highway system exists upon a particular boundary of his property, provided that full and unobstructed ingress and egress to and from his property to an extent reasonably necessary for its full beneficial use is unimpaired. He has no vested right in any particular avenue of the highway carrying any particular flow of traffic, but only a right to have his land front upon a part of the highway system sufficient to afford reasonable access to his property.

The fallacy of my associates' reasoning in this regard is illustrated by the statement: "We recognize that the defendants have no property right in any particular flow of traffic over the highway adjacent to their property, but they do possess the right of direct access to the through traffic highway and an easement of view of their property from such highway. If traffic normally flowing over that highway were re-routed or if another highway were constructed which resulted in a substantial amount of traffic being diverted from that through highway the value of their property might be diminished, but in such event defendants would have no right to compensation by reason of such re-routing or diversion of traffic. The re-routing or diversion of traffic in such a case would be a mere police power regulation, or the incidental result of a lawful act, and not the taking or damaging of a property right. But here we do not have a mere re-routing or diversion of traffic

from the highway; we have, instead, a substantial change in the highway itself in relation to the defendants' property rather than a mere re-routing of traffic in relation to the highway. Defendants' private property rights in and to that highway are to be taken and damaged. It is only for such private property rights that compensation has been assessed. The court allows no damages to be predicated on any diversion of traffic from the highway but it did properly allow damages to be based on diversion of the highway from direct access to defendants' property.''

If this language means anything, it creates in an abutting owner a vested right in a specific traffic avenue carrying a particular burden of traffic. Carried out to its necessary implication, it will also entitle the property owner upon an undivided highway to damages whenever the street is reconstructed, in accordance with modern highway engineering practice for the safety and convenience of the traveling public, into highspeed separated freeways for through traffic divided by curbings from lanes constructed for purposes of local and intersecting traffic, with openings into the main freeways only at comparatively widely spaced intervals. For obviously, under such circumstances, the abutting owner no longer may go directly from his property to the lanes of the highway carrying the through traffic, upon which his land formerly abutted. More specifically, the majority opinion approves an award of damages based in part not only upon testimony that the respondents' land will be less valuable because of the additional distance one must travel from it in order to reach the through lanes upon Rosemead Boulevard, but also, although not expressly stated, for the additional distance one must travel on the lanes for local traffic which are a part of Ramona Boulevard before he may enter the freeways carrying the main flow of traffic along that highway.

The prohibitive effect which the allowance of recovery for such a factor will have upon the construction of increasingly necessary arterial freeways, without grade crossings, to serve centers of large population, is readily apparent when one considers such contemplated highway projects as the proposed Bayshore freeway to bear the traffic from San Francisco down the Peninsula as far as Palo Alto and, eventually, to San Jose, and the similar freeway being considered for traffic from San Fernando to San Pedro in Los Angeles County,

both of which include numerous structures for grade separation similar to that shown by the plans in the present case. And it may also be assumed that, in accordance with standardized engineering practice, a substantial portion of these highways will be built at a grade much lower than adjoining streets.

But the majority opinion adopts a rule, creating a property right never before recognized, without the citation of a single authority in support of its unique position. As a matter of fact, the law throughout the United States is uniformly to the contrary. For example, in what is probably the most recent case involving the problem, it was held that the owner of property could not recover consequential damages because travelers to and from his premises would have to travel a distance of approximately 2,000 feet farther in order to reach the newly located highway. (*In re Board of Sup'rs of Chenango County*, 13 N.Y.S.2d 730 [1939].) Consequently, even if it is accurate to state that the proposed improvement will result in a "diversion of the highway from direct access to defendants' property," no recovery should be permitted.

Furthermore, it is apparent that, despite such juggling of words as "re-routing of traffic" as distinguished from "re-routing of the highway," the element of damage involved in either is the same. The diminution in value, if any, to an abutting landowner will arise from the fact that the traffic formerly passing adjacent to his property will no longer be able directly to reach his land without traveling an additional distance. And, as the majority opinion has recognized, the law is settled in this state that such an element of damage is noncompensable. (*Rose* v. *State of California, supra,* at p. 737; *City of Stockton* v. *Marengo*, 137 Cal.App. 760, 762, 763 [31 P.2d 467]; *People* v. *Gianni*, 130 Cal.App. 584 [20 P.2d 87].)

And although I am convinced that the service roads are an essential and integral part of Highway 168, even were the majority opinion's treatment of them as entirely separate and distinct highways correct, the allowance of recovery for the additional distance to be traveled in order to reach the main highway is squarely contrary to the limitations which these same members of the court have placed upon damage caused by circuity of travel in the cul-de-sac cases, by the decision in *Bacich* v. *Board of Control, ante,* p. 343 [144

P.2d 818]. For since the Ricciardi property is located upon a corner which abuts upon roadways with an outlet at either end into connecting streets, it is not located in a cul-de-sac.

In estimating the severance damages suffered by the respondents, their appraisers testified to a loss of visibility which will occur by reason of the construction of the subway. However, as there will be no impairment of view from the Ricciardi property caused by the change in grade of the lanes passing through the underpass or by the subway structure, the problem is factually limited to whether an owner of land has an easement of view *of* his premises from the street or highway which entitles him to compensation because, by the change in grade necessitated for vehicles to travel through an underpass, his property cannot be seen at all times.

My associates' treatment of the question is summary. "The weight of authority seems to be in favor of the proposition that an abutting owner of property on a public highway has an easement of reasonable view of his property from the highway," states the opinion. "The right of reasonable view, in addition to the right of ingress and egress, is named as one of the easements possessed by the abutting owner in *Williams* v. *Los Angeles etc. Ry. Co.*, 150 Cal. 592, 595 [89 P. 330]." However, although the rule stated is correct insofar as it goes, it has no application to the facts of this case. For the doctrine of the decisions cited in the annotation relied upon by the majority opinion in support of its statement more accurately is that there is an easement or property right of view both to and from the street as against obstruction by an adjoining owner or other private individual. But no such right exists as against the state when the view of the premises by passersby is impaired by the erection of such structures as are reasonably necessary to secure the safety or promote the convenience of the traveling public. (*Perlmutter* v. *Greene*, 259 N.Y. 327 [182 N.E. 5, 81 A.L.R. 1543]; *McCarthy* v. *City of Minneapolis*, 203 Minn. 427 [281 N.W. 759]; 1 Lewis on Eminent Domain, *supra*, sec. 124, pp. 191-193; 25 Am.Jur., Highways, sec. 155, pp. 451, 452, sec. 319, p. 613; and see *Kelbro Inc.* v. *Myrick* (1943), 113 Vt. 64 [30 A.2d 527, 530, 531]; but see *Liddick* v. *City of Council Bluffs* (1942), —— Iowa —— [5 N.W.2d 361, 374, 379]; 4 McQuillin, op. cit., sec. 1488, p. 198; notes, 90 A.L.R. 793, 40 A.L.R. 1321.)

Thus, in Lewis on Eminent Domain, although the author recognizes the right of the abutting owner to an unobstructed view to and from any part of the street, he declares: ''This right is subject of course to all legitimate street uses, but it cannot be interfered with for private purposes with or without compensation nor by structures placed in the street for public purposes which are not legitimate street uses, unless compensation is made.'' (2 Lewis on Eminent Domain [3d ed. 1909], sec. 124, pp. 192, 193.) And American Jurisprudence states the rule as follows: ''It is well established that an abutting owner has also an easement of view of his premises from every part of the street or highway, as well as from his premises into the way, of which he cannot be deprived by encroachments placed on the way by an adjacent proprietor, although there are some holdings to the contrary. . . . But such easement of view is likewise subject to the enjoyment of the public right in the highway, and the erection by the public authorities of such structures as are reasonably necessary to secure the safety or promote the convenience of travelers does not constitute an unlawful interference therewith.'' (25 Am.Jur., Highways, sec. 155, p. 452.)

This principle is recognized in *Williams* v. *Los Angeles etc. Ry., supra,* where the court indicated that the private railway company would not have been subject to liability for impairment of the right of view by the erection of a switch tower in front of the plaintiffs' premises had the construction of the tower been essential for the operation of the railway. The reason for such distinction is obvious. An adjoining landowner obviously has no right to place obstructions in the public highway to the detriment of the owner of abutting property. He is, however, free to erect whatever structures he sees fit within the boundaries of his property, even though such structures may interfere with the former view enjoyed by his neighbor and cause reduction in the value of the latter's land. A similar situation arises when the state for admittedly proper highway purposes erects necessary structures for the convenience or safety of traffic, and the state should no more be required to pay for the resulting damage to abutting owners than would the private person for lawful acts upon his land. Consequently since, in the present case, the portions of the highway from which no view of the Ricciardi premises will be possible must be lowered in order to carry

the traffic beneath the railroad tracks in furtherance of an undeniably proper highway purpose, no compensation should be allowed the respondents for such interference with the passing traffic's view of his land.

In considering the function of the court and the jury in a condemnation action, the. majority opinion states that whether there has been a substantial impairment of a property right, "is a question of law, or of fact, or a mixed question of law and fact, for the trial court to determine. In no case is it a 'question of fact for the jury' to determine." This statement is fundamentally unsound and confusing. An issue of fact determinable by the court may, under certain circumstances, be submitted to the jury. (See cases collected in 10 Cal.Jur. Eminent Domain, sec. 107, p. 411.) And upon an appeal from the judgment, if the issue is one of fact, the sole duty of the appellate court is to ascertain whether there is evidence, or inferences properly to be drawn from the evidence, in support of the determination. On the other hand, if the issue is one of law, the court must exercise its independent judgment upon the evidence presented by the record.

As I understand the authorities upon this subject, the nature and extent of a property right within the meaning of the eminent domain provision of the Constitution presents a question of law. Where, however, the right is so defined that its extent or impairment depends upon a factual element, such as, in the present case, the limitation of the easement of access to such portion and width of the street as is reasonably necessary for the purposes of ingress and egress of the abutting owner, considering the nature of his property and the particular uses to which it is adaptable, the determination of this variable factor clearly falls within the province of the trier of fact even though its decision upon that question necessarily includes a finding as to whether an impairment of the easement has occurred. Of course, the question as to the amount of injury sustained is one for the trier of fact to determine upon evidence confined to compensable items of damage.

In my opinion, for the reasons stated, the judgment should be affirmed insofar as it awards the respondents $9,350 for the land appropriated by the State; as to the amount awarded for consequential damages, the judgment should be reversed for a new trial upon that issue.

CURTIS, J.—I concur in the conclusion reached in the dissenting opinion.

TRAYNOR, J.—I dissent for reasons set forth in my dissenting opinion in *Bacich* v. *Board of Control, ante,* p. 343 [144 P.2d 818].

Appellant's petition for a rehearing was denied January 17, 1944. Curtis, J., Edmonds, J., and Traynor, J., voted for a rehearing.