[Civ. No. 5171. Fourth Dist. Aug. 3, 1956.]

THE PEOPLE ex rel. Department of Public Works, Appellant, v. FRANK COZZA, Respondent.

George C. Hadley, Paul E. Overton, and Joseph A. Montoya for Appellant.

A. V. Falcone for Respondent.

BARNARD, P. J.—This is an appeal from an interlocutory judgment condemning three parcels of land, for use in constructing a freeway between San Diego and the international border at San Ysidro. These parcels were part of a farm of 145.9 acres owned and operated by the defendant. This farm was an irregular tract nearly a half mile wide on the north and on the south, but with a narrow neck in the middle which was approximately 1,000 feet from east to west, and 1,200 feet from north to south. The new freeway crosses the defendant's property near the middle of this narrow neck. The remaining property north of the freeway is 86.57 acres, and that south of the freeway is 54.50 acres. One of the parcels taken, Parcel 14, is the part of the narrow neck thus occupied by the freeway. It is 166 feet wide, about 1,000 feet long, and contains 4.03 acres. The other two parcels taken, Parcels 15-A and 15-B, are located at the northwest corner of defendant's land, some half mile from the narrow neck, and have no important bearing on the controversy here. Parcel 15-A contains 0.07 acres, and Parcel 15-B contains 112 square feet.

It appears, without dispute, that the defendant farmed this property as a unit, having bought it for that purpose. He was raising row crops, largely celery, tomatoes and cucumbers. The soil and climate are particularly adapted to this purpose, and such farming is unusually expensive but produces large returns. The defendant lived on the property and maintained a crew living on the premises of between 40 and 45 at times, with a yearly average of 25. He had heavy and extensive equipment which was moved about the farm as needed. The headquarter buildings are on the part north of the new freeway, but that portion of the farm has no independent source of water. Water was produced by three wells on the portion of the farm south of the new freeway, and water was taken to the north part, through the narrow neck, by a pipeline. In constructing the freeway it was necessary to cut this pipeline, but as part of the construction plans this pipeline was reconnected by a pipe running under the freeway through a larger pipe, so as to enable that portion of the pipeline to be withdrawn for repairs. The freeway

as completed across defendant's property was five feet above the ground on either side and fences were erected along both sides of the freeway, making it necessary for men and equipment to be moved from a mile to two miles in going from the south part of the farm to the north part. In doing this it would also be necessary for the men and equipment to be moved across this heavily traveled freeway at a point near the northwest corner of the defendant's property, and there was a great deal of evidence with respect to the difficulty, danger and expense involved in doing this.

The defendant's answer alleged that the value of the three parcels taken was in excess of $8,205, and that the severance damages would be $40,570. An amended answer, filed on the first day of the trial, alleged that the value of the parts taken was $8,300 and the severance damages $141,797.50. One witness for the plaintiff valued the property taken at $7,290 and the severance damages at $5,710. The other witness for the plaintiff valued the property taken at $6,205, and the severance damages at $3,015. Four witnesses for the defendant valued the property taken at $8,205 and the severance damages at $141,797.50. The other witness for the defendant valued the property taken at $8,300 and the severance damages at $97,785. The jury, which had viewed the property, valued Parcel 14 at $8,060, Parcel 15-A at $140, Parcel 15-B at $6.00, and fixed the severance damages at $56,428. The court adopted the jury's findings as to values and damages, and by its findings and judgment awarded the defendant a total of $64,634. No motion for a new trial was made, and the plaintiff has appealed from the judgment.

No complaint is here made with respect to the award for the value of the three parcels taken, and no severance damage appears in connection with Parcel 15-A and Parcel 15-B. The controversy here is with respect to the severance damages allowed in connection with Parcel 14, the taking of which interfered with the operation of defendant's farm as theretofore conducted. All of the witnesses on both sides testified that the taking of Parcel 14 would damage the remaining part of the ranch, and all of them testified that the highest and best use of the land was agricultural and for row crops, which was the use to which the land was being put. Reasons for the opinions on value were given by all witnesses and the witnesses for the defendant, in addition to such matters as the increased cost, difficulty and danger in the operation of the two parts of the farm, testified to other elements of damage

in such matters as flood hazard and the draining of waters onto the property from a long stretch of the freeway.

Appellant's first contention is that the court committed prejudicial error "in striking the testimony" of its first witness. It is argued that appellant's theory was that the highest and best use of the remaining property was to develop and operate it as two separate farms; that as so operated the remaining property would have had substantially the same market value after the taking as it had before; and that the striking of the testimony of this witness, and the rulings of the court in this connection, had the effect of preventing the appellant from presenting its theory of the case to the jury and the reasons upon which appellant's witnesses based their opinions.

This witness, Mr. Cotton, was a real estate agent with no experience in farming. He testified that in his opinion the highest and best use of this land both *before and after* is for agricultural purposes, for farming, and "as it was then and is now farmed." He was then asked what the highest and best use would be *after* the taking of Parcel 14. An objection was sustained, the court stating that he had already said it was the same before and after. He was then asked what was the highest and best use of the remaining property after the taking. An objection was overruled and he replied that in his opinion the highest and best use after the taking "is for the operation of the property agriculturally as farms." He was then asked his reasons for that opinion and replied that in his opinion "the property could be better operated as two farms afterwards than it could be as one farm afterwards." A motion to strike this answer was granted, and the jury was told not to consider that answer. However, this witness testified on cross-examination that in arriving at his figure of $5,710 as severance damage he considered that the amount of damage would depend on how the defendant operated; that if he continued to operate by moving men and equipment from one part of the farm to the other the amount of damage would be increased; that "I consider he might operate it that way but I don't consider that to be the practical way to operate it"; that his figure of $5,710 was based upon how he thought a prudent farmer would operate the property; that he thought $5,700 would be adequate compensation "because that is based upon my opinion of fair market value before and after"; and that if the defendant operated the way he had been doing he might be damaged by more than

$5,700. In this connection the court instructed the jury that it could not consider this land as being operated by two separate owners; that it was to figure the damages on the basis of ''one ownership as it is now''; and that ''the owner of course is required to meet the changing conditions with what we call reasonable husbandry. He can't just sit tight and let things stay as they are if a reasonable, prudent farmer operating that would make reasonable changes within his means in doing it.''

No authority is cited for the theory that plaintiff was entitled to show that the highest and best use of the remaining property was to develop and operate it as two separate farms, and we have found none. ▮▮▮ That the remaining property should be considered as a unit in determining the severance damages is indicated by the language used in section 1248 of the Code of Civil Procedure, and the principles expressed in *People* v. *Ricciardi,* 23 Cal.2d 390 [144 P.2d 799], where the court approved as a proper element of severance damages ''the impairment of the use of the property as a functioning unit caused by the taking'' of the portions sought to be condemned. This view is confirmed by the principles pointed out in *Welton* v. *State Highway Com.,* 211 Iowa 625 [233 N.W. 876], and in 29 C.J.S., sections 139, 140, 981, 982, 274, and 1270. The defendant had purchased this land for operation as a unit after rejecting smaller tracts, and had so operated it. There are well-known advantages in operating a larger tract of land as a unit, especially where it involves the use of large numbers of men and extensive and large equipment. Under established principles it would seem logical that the severance damage actually caused to this defendant should be the damage to his continued operation of the farm as a unit. ▮▮▮ The conjectural question as to the possibility of his réducing the damage by dividing the equipment and men between the two parts of the remaining land, with the erection of new buildings on the southerly part, should not be allowed to affect the basic question as to the highest and best use of the land, where the land had been and was being used as a unit and where the northern portion of the remainder was absolutely dependent upon the southern portion for irrigating water. Under the circumstances, it was not error for the court to strike the one answer here in question. As a practical matter, no prejudice appears because evidence of the plaintiff's theory was before the jury and the court's instruction was sufficiently broad to permit them

to consider it, although it rather obviously appears that the jury was not impressed by that theory.

It is next contended that the court erred in instructing the jury as follows: ". . . and that remaining property damage is this: it is the difference between the fair market value of property before the freeway was taken or any construction was put in, to wit, July 24, 1953, and the fair market value of that remaining property as it exists after the completion of the freeway and the location it is now." It is argued that this instructed the jury to follow an improper method of computing severance damages; that it told the jury to find the severance damages to the remaining property by subtracting the fair market value of the remainder after the completion of the freeway from the fair market value of the whole property before any parcel was taken; that this required the plaintiff to pay twice for the value of the parts taken, once in valuing the parts taken and again in valuing the severance damage; and that this instruction alone caused the verdict of the jury as to severance damages to be excessive, at least in the amount of $8,206. The language used in the portion of the instruction complained of is not reasonably subject to this interpretation. The above quoted language was in the middle of a long instruction. Immediately prior to the quoted language the court told the jury that in considering the damages to the remaining property it was to consider the opinions given by the experts and other qualified witnesses with the reasons given by them, and all of the facts shown by the evidence. Immediately after the quoted language the court said: "All of these separate things you are to consider; you are entitled to talk them over but lets get back and reduce it to our measure that the law contemplates, not a particular use, not an individual's ideas, but the fair market value, the difference between the property left as it was before the improvement was put in and after the improvement was put in." It clearly appears from the instruction as a whole that in the portion complained of the court was talking only about the damage to the remaining property and not the value of the original property before the improvement was made. There were not "two diametrically opposed instructions," as argued by the plaintiff, and in view of the instruction as a whole it cannot reasonably be held that the jury may have been misled with respect to the proper method of computing severance damages.

It is next contended that the court erroneously instructed

the jury to value the property as it was used by respondent. The various contentions under this point are sufficiently covered in the first point herein considered. The instructions in this connection, as a whole, were proper under the evidence and no reversible error appears therein.

It is next contended that the court instructed the jury to adjust the evidence so it would preponderate on the side of the defendant. Again, this refers to a portion of a long instruction taken out of context. In this instruction, covering the burden of proof or preponderance of the evidence, the court told the jury that it is not the amount of preponderance but whether the evidence preponderates in favor of or against the person having the burden of proof that is controlling; that in connection with the values and damages to be considered in this case the burden of proof by a preponderance of evidence "is on Mr. Cozza"; that it should arrive at the figures respecting the value of the property taken and the amount of damage caused by determining where the preponderance of the evidence lies on those issues. This is followed by the sentence complained of, which reads: "You can talk over together your separate figures, and if you come to an equal balanced place then you have got to adjust it so that the preponderance lies on the side as established by Mr. Cozza." This was immediately followed by these words: "That doesn't mean you can only consider his witnesses. It means that you can consider all of the evidence introduced in the case no matter by whom introduced, but it gets back to the fact that whatever is established as the value must be established by Mr. Cozza by this preponderance of the evidence." It clearly appears that in the sentence complained of the court meant that if the evidence seemed to be evenly balanced it would have to be found that the preponderance lay with the defendant before a judgment for such amounts could be entered in his favor. The court was instructing the jury orally and as a natural result all portions were not too well expressed. However, in view of the instruction as a whole it cannot reasonably be held that the jury was misled in this connection or that, as argued by the appellant, this quoted sentence was tantamount to a directed verdict on the evidence produced by the defendant.

It is next contended that the court instructed the jury that this trial was before it because governmental agencies seek to coerce property owners. It is argued that it is well known that jurors are quite apt to give great weight to any

hint from the judge as to his opinions concerning a case, and that the judge's remark "you'd be surprised to learn what governmental agencies in the past have tried to get away with" prejudiced the plaintiff's case and caused the jury to base its verdict on undue sympathy for the "coerced" defendant.

In the course of his instructions the judge explained that this was a proceeding in eminent domain or condemnation, and explained what that means. He explained that if the parties in such a proceeding failed to agree on the amount of compensation that is fair to both sides then they have the right under our American system of submitting this to a jury. The judge then made the statement above quoted and referred to a case about 1867 where Congress passed a law condemning land for a dam site and fixing the amount to be paid, and the landowner took the case to the Supreme Court of the United States where the rule was established that under our form of government no power was vested in anyone except a jury to determine the amount that should be paid. While these remarks were entirely unnecessary, and would much better have been omitted, it clearly appears from the entire instruction that there was no suggestion of "coercion" in this case. The right of the plaintiff to take this property was not questioned during the trial, there had been no evidence of any coercion, and the only issues presented were those relating to the respective amounts of compensation to be paid. The court also instructed the jury to disregard any idea or comment or conclusion which he may have made respecting the facts in the case. It cannot reasonably be concluded that the verdict was in any way affected by the remark here in question.

 Finally, it is contended that the judgment as entered is in excess of the court's jurisdiction in two respects. It is first contended that the judgment fails to condemn a fee simple title to the plaintiff because it provided that the defendant should have an irrevocable easement, within the boundary lines of the freeway, to maintain and repair the water pipeline, which was constructed by the plaintiff in accordance with the freeway construction plans. It is argued that the resolution adopted by the highway commission authorized the plaintiff to acquire a fee simple title in the lands condemned; that this resolution is controlling and binding as to the quantum of the estate to be condemned; that the

resolution is by statute made conclusive evidence that the interest in the property sought to be acquired is necessary; and that a judgment granting a lesser estate is erroneous and must be reversed. This refers to the pipeline carrying water from the remaining property south of the freeway to the portion north of the freeway, which pipeline the plaintiff severed during the construction work and then reconnected through a larger pipe under the freeway in order that the pipeline could be serviced and repaired when necessary. It appears, without conflict, that this matter was included in the construction plans of the plaintiff and it was repeatedly stipulated during the trial that this pipeline was to remain there, that it was a part of the proposed improvement, and that a provision giving a nonrevocable easement for that purpose to the defendant should be included in the judgment. The court accepted the stipulation to this effect and took the matter from the jury's consideration, telling the jury that the parties had stipulated to the pipeline easement. The judgment gave the plaintiff exactly what it asked for and agreed to, and no reversible error appears in this connection. We find nothing in the case of *People* v. *Schultz Co.*, 123 Cal.App.2d 925 [268 P.2d 117], which suggests or compels a different conclusion.

It is further contended that the judgment fails to grant a clear title to the plaintiff since it recites that the remainder of the defendant's property is adequate security for two existing trust deeds and a crop and chattel mortgage, but fails to cancel these instruments; and since it did not provide for the payment or cancellation of taxes. These trust deeds and the mortgage were those held by the other defendants, who have not appealed. These defendants not only defaulted, but filed a waiver waiving any payment from the judgment, acknowledging that their liens were adequately secured by the remainder of the defendant's farm, and stipulating that the court might find accordingly. No possible prejudice appears. The taxes were all paid and there were no tax liens on the property at the time, as appears from the certificate of the county auditor which was filed before the judgment.

The amount of severance damages fixed by the jury appears to be quite liberal, but it is supported by the evidence. The jury viewed the premises, and it was conceded by everyone that the remaining property was damaged to a considerable

extent. Under the evidence it cannot be held that the amount arrived at by the jury was the result of passion or prejudice. The amount allowed might well have been reduced on a motion for a new trial, but no such motion was made.

The judgment is affirmed.

Griffin, J., and Mussell, J., concurred.

A petition for a rehearing was denied August 30, 1956, and appellant's petition for a hearing by the Supreme Court was denied September 25, 1956. Traynor, J., and Spence, J., were of the opinion that the petition should be granted.